BRODHEAD and others vs. THE CITY OF MILWAUKEE and others.

PORTER VS. THE SAME.

The legislature cannot create a public debt, or levy a tax, or authorize a municipal corporation to do so, in order to raise funds for a mere *private* purpose.

The objects for which money is raised by taxation must be *public*, and such as subserve the common interest and well-being of the community required to contribute.

To justify a court in declaring a tax void, and arresting proceedings for its collection, the absence of all possible public interest in the purposes for which the funds are raised must be so clear and palpable as to be immediately perceptible to every mind.

Claims founded in equity and justice, in the largest sense of those terms, or in gratitude or charity, will support a tax.

It is competent for a state legislature to authorize municipal corporations to raise money by taxation for the payment of bounties to volunteers who may enlist in the military service of the United States under an act of Congress and a call of the President of the United States, and may be credited to such town, city or village upon its quota under such call.

Chap. 14, Laws of 1865 (which empowered the qualified electors of each town, city or incorporated village in this state, at any annual or special meeting thereof, to raise by tax such sums as they might deem necessary to pay bounties to volunteers who might have enlisted, or should thereafter enlist under the call of the President of the United States, of December 19th, 1864, for 300,000 men, or who should thereafter enlist under any call of the President which might thereafter be made, and become credited to such town, city or village under such calls, and also to persons who should procure substitutes for themselves before being drafted, and have them credited to such town, city or village upon its quota under any such call, and for the purpose of giving aid to families of volunteers and drafted men in the service of the United States or of this state—with a limitation as to the amount to be paid any such person or family), was a valid enactment.

The act was not invalid because it required such tax to be extended on the assessment rolls of the previous year.

Said act was applicable to the city of Milwaukee.

Brodhead et al. vs. The City of Milwaukee et al.

Courts must determine questions as to the power of the legislature under the constitution, when such questions are properly presented, but cannot arrest the operation of a statute on the ground that it is unwise, unjust or oppressive, when no question of legislative power is involved.

If the room at which the election in this case was called was small, inconvenient or inaccessible to large numbers, the electors, or a majority of those present, might adjourn to some more suitable place, making proper announcement thereof, and causing proper notice to be given to voters who should come afterwards; such power not being expressly *taken away* by statute, and being incident to all corporations at common law.

A tax levied in said city for the purposes mentioned in said act *held* not to be invalid by reason of alleged irregularities or defects (*vide infra*) in the proceedings of the special meeting of the electors of said city by which the tax was voted.

DOWNER, J., *dissenting*, was of opinion that so much of the act as authorized the payment of bounties to volunteers who should have enlisted *before* the voting of the tax, was *void*, on the ground that the several towns &c. had no *special* public interest in the payment of such bounties. He also thought the act was inapplicable or void as to a city, consisting of several wards, because such a city had no *quota*, in the strict sense of the term, and its citizens no common interest in filling the quota of any separate ward; that it was inapplicable to a city containing (like Milwaukee) eight thousand voters, because it contemplated only one place of voting by ballot, and did not provide the requisite machinery for taking the ballots of so many electors in the time prescribed; and that the proceedings at the special meeting in Milwaukee were invalid on the further ground that such meeting was called and held in a room incapable of containing more than one-eighth of the electors, all of whom were entitled to be present and vote upon all questions submitted to the determination of such meeting.

APPEAL from the Circuit Court for *Milwaukee* County.

Chapter 14, Laws of 1865 (approved and published February 2d), provides as follows:

"Sec. 1. The qualified electors of each town, city and incorporated village in the state, shall have power, at any annual or special meeting thereof, to raise by tax such sum or sums of money as they may deem necessary to pay bounties to volunteers who may have enlisted, or who may hereafter enlist, under the call of the President of the United States, of December 19th, 1864, for 300,000 men, and who shall hereafter enlist under any call of the President which may hereafter be made, and become credited to such town, city or village, under such calls; and also to persons who shall procure substitutes for

themselves before being drafted, and have them credited to such town, city or village, upon its quota under any such call, and for the purpose of giving aid to the families of volunteers and of drafted men in the service of the United States, or of this state: *provided*, that no more than two hundred dollars shall be paid to any such volunteer or person furnishing a substitute, or to the family of any volunteer or drafted man, out of the money so raised."

"SEC. 2. A special meeting may beheld in any town, city or incorporated village of this state, for the purpose or purposes mentioned in section one of this act, upon a written petition to the clerk thereof, signed by five or more qualified electors and freeholders of such town, city or incorporated village, which petition shall set forth the purpose or purposes for which said special meeting is asked by the petitioners, together with the amount of money sought to be appropriated or raised by tax at such meeting for said purposes; and it is hereby made the duty of every such clerk, upon presentation to him of such petition, to call a special meeting of the qualified electors of such town, city, or village, by posting notices of the same in three or more public and conspicuous places in such town, city, or village; stating the time when, designating the hour and the place where such meeting will be held, and the object of the same, together with the amount of tax proposed to be voted, thereat, which notice shall be so posted not less than five nor more than ten days previously to the time appointed for holding such special meeting. Such meeting, if in any town, shall be held at the place of the last town meeting in such town, wherever the same shall be practicable, and shall be opened and conducted in the manner provided by law for holding annual town meetings, and the vote shall in all cases be by ballot. In all other cases, such meetings shall be held at the place designated therefor in the petition asking for the same. The board of inspectors for meetings in cities and villages, shall be chosen by a majority of the electors present at

Brodhead et al. vs. The City of Milwaukee et al.

the opening of the polls, and the village or city clerk (as the case may be) shall be the clerk of the said polls,  *  *  * and the same laws which now govern the holding of elections, as to time of opening and closing the polls in cities and villages, shall govern the holding of the meeting contemplated by this act; *provided*, that the electors assembled at any such meeting, not less than twelve in number, may, before proceeding to vote on the question of raising any such tax, agree or determine upon a less sum to be voted for any such purpose than the amount named therefor in the petition aforesaid; and a correct and complete record of the proceedings of every such meeting shall be kept, in which shall be stated the amount of tax voted thereat, and the purpose for which the same was voted; and such proceedings shall be signed or attested by the officers thereof, and filed and recorded in the office of the clerk of the proper town, city or village; *and provided, also*, that the board of supervisors of any town, the common council of any city, or the board of trustees of any village, in which a tax or taxes shall have been voted at a meeting held for that purpose in pursuance of this act, shall be authorized to issue town, city or village orders, as the case may be, not exceeding in amount the sum so voted to be raised by tax, bearing interest of not more than seven per cent. per annum; and such orders may be made payable at such time or times, and at such place as such respective boards may determine within the period or periods limited for the collection of such taxes; and such orders shall be receivable in payment of any taxes of such town, city or village, as the case may be, at any time after the same shall become due and payable."

" Sec. 3. The town board of supervisors of every town, the common council of every city, and the board of trustees of every incorporated village, in which the qualified electors thereof have, at any meeting called for that purpose, voted a tax upon the taxable property of such town, city or incorporated village, for the purpose of paying bounties to volunteers

for filling the quota or quotas of such town, city or village, or for the purpose of supporting families of volunteers or families of drafted men, or for any of the purposes mentioned in section one of this act, or which may vote such tax for any or all of said purposes prior to the fifteenth day of February, eighteen hundred and sixty-five, are hereby authorized and empowered to make or cause to be made a copy of the last assessment roll or assessment rolls of real and personal property of their respective towns, cities or incorporated villages, and upon the valuation of said property, to apportion and carry out in said rolls the said tax so voted for the purposes aforesaid, or shall apportion and carry out said tax upon the assessment roll in the hands of the treasurer or other officers, and cause a warrant for the collection of said tax to be annexed thereto, which warrant shall be made by the proper officer, and shall conform as near as practicable to the warrant prescribed by law for the collection of other taxes, *   *   *   ."

".Sec. 10. In each and every case where the qualified electors of any town, city or incorporated village, at a town, city or village meeting called or held with the intent to comply with any law of this state, shall have heretofore voted or shall hereafter vote a tax upon such town, city or village for the purpose of paying bounties to volunteers theretofore enlisted or who shall thereafter enlist in the service of the United States under a call of the President for volunteers, or for the purpose of aiding the families of such volunteers or drafted men, or for any of the purposes authorized by this act, the proceedings of such meeting, and the tax or taxes so voted thereat, shall be as valid and legal to all intents and for all purposes, as if the provisions of any such law had been all literally and strictly complied with, notwithstanding there may have been errors, omissions or mistakes in giving the notice of such meeting, or in the time or place of holding, or in the manner of conducting the same ; *provided*, that nothing herein contained

shall be so construed as to legalize or validate any act or proceeding founded upon or growing out of actual fraud."

On the 8th of said month of February, a petition was presented to the clerk of the city of Milwaukee, signed by more than five qualified electors and freeholders of said city, requesting him to call a special meeting of the qualified electors of said city pursuant to said act, "for the following purposes: First to vote to raise by tax, pursuant to said act, the sum of one hundred and twenty thousand dollars, to pay bounties to volunteers, who may have enlisted," &c., following the language of the statute; "Second. To vote to direct the common council of the city of Milwaukee to apportion among the several wards of the city, the sum of one hundred and twenty thousand dollars, or whatever sum may be voted at said meeting, for the purposes aforesaid, in the proportion following, that is to say: to each ward the proportion of the whole sum so voted that the number of the quota of such ward bears to the whole number of men in the aggregate to be raised by all of said wards under said call." The petition further asks that said meeting be held at the City Hall of said city, on the 14th of said month of February. The clerk thereupon issued and published in the manner prescribed by law, a call for such a meeting, to be held at the time specified in the petition, at the common council room in the City Hall in said city, stating that the meeting would be opened and held in the manner prescribed by law, and that the polls would be open from nine A. M. to five P. M. of the day specified. The meeting was accordingly held, and the record of its proceedings, signed by the persons hereinafter named as inspectors, and countersigned by the secretary, and filed in the office of the clerk of said city, recites that said meeting was held pursuant to the notice duly given by the city clerk, "for the purpose of voting on the question of raising by tax the sum of $120,000, for the purpose of paying bounties," &c. &c., proceeding in the words of the statute; "Second. To vote to direct the common council," &c. &c., proceeding in the

words of the petition as above set forth.    It then adds that the
meeting was opened at 9 o'clock A. M. of said 14th of Febru-
ary, and Chas. H. Larkin, William Sauer, and Mathias Human,
of the city of Milwaukee, were thereupon duly elected inspec-
tors of such meeting, by the electors of said city present at its
opening; that previous to the opening there were present at
the meeting one hundred or more qualified electors and free-
holders of the city of Milwaukee; that on motion of &c.
it was moved that the amount stated in the notice of
election to be voted for, be reduced to one hundred and nine-
teen thousand dollars, and that the vote be taken on that sum,
which motion was adopted : that the polls were opened at 9
o'clock A. M., and remained open until 5 o'clock in the after-
noon of said day ; that prior to the opening of said polls, the
said inspector and secretary duly took and subscribed the oath
thereto annexed ; that the whole number of votes polled at such
meeting was two thousand four hundred and fifty, of which
there were cast in favor of raising by tax the sum of one hun-
dred and nineteen thousand dollars for the purposes aforesaid,
one thousand six hundred and sixty-three votes; *   * and
against raising by tax [said sum], seven hundred and eighty-
seven votes ; none scattering.

On the 18th of the same month the board of aldermen of
said city adopted a preamble and resolutions, by which, after
reciting the action of said special meeting of electors, they de-
termined that said sum of $119,000 should be levied as a
special tax upon all the real and personal property of said city,
and directed the making out of an assessment roll and apportion-
ment of the tax, and a delivery of the same to the city treas-
urer, with a warrant for the collection of the tax as prescribed
in said chap. 14. They then provided for bounties of $200 for
the several classes of persons named in said chapter; directed
the issue of city orders for the payment of such bounties; and ap-
propriated any surplus of such tax that might remain after pay-
ing said bounties, to the support of the families of men who might

be drafted under said call. On the 20th of the same month these resolutions were adopted also by the board of councillors of said city.

The first of the above named actions was brought by thirty-three residents and owners of real and personal property in said city, in their own behalf and that of all others, &c., against the city of Milwaukee and the mayor, clerk, treasurer and comptroller thereof, to restrain them from issuing, or authorizing the issue of, any of said city orders for said sum of $119,000, or receiving any such orders in payment of any taxes of said city, or levying or collecting the above named tax. The complaint alleges, *inter alia*, that said city is subdivided into nine distinct wards, each of which is represented in the common council; that under an act of Congress, approved February 24th, 1864, each of said wards forms a distinct district, the residents whereof, liable to military service, are enrolled, and to each district is assigned, under any call of the President for men for the military service of the United States, a certain quota, and unless this is filled within the time designated by the President, the number necessary to make up any deficiency are drafted from said residents, and upon the persons so drafted is imposed the obligation to furnish a substitute or enter into the military service of the United States; that on or about the 19th of December, 1864, the President, in pursuance of said act of Congress, issued his proclamation calling for three hundred thousand men; that subsequently, under said act, quotas were assigned by the war department of the United States, or the officers acting under its authority, to the residents liable to military service in each of said wards, which were as follows: 1st ward, 56; 2d ward, 66; 3d ward, 103; 4th ward, 75; 5th ward, 48; 6th ward, 35; 7th ward, 96; 8th ward, 29; 9th ward, 88; that by said proclamation the time allotted for furnishing the men was up to the 15th of February, 1865, after which day the residents liable to military service in any district in the United States to which quotas

had been assigned, were liable to a draft from their number to supply any deficiency in their quota; that after said 19th of December the residents in each of said wards, both those liable to military service and others, exerted themselves, by the voluntary contribution of money and otherwise, to procure voluntary enlistments, but such exertions and contributions varied very much in the different wards, both in the amount contributed and the proportion of the amount contributed to the ability to contribute; that some of the residents of said wards, liable to military service, furnished, as they had a right to do, under said act of Congress, substitutes for themselves, and paid therefor sums varying from six to eight hundred dollars; that the numbers due from said several wards on or about the 14th of February, 1865, after said quotas had been reduced by voluntary enlistments and substitutes since the time of said call, were as follows: 1st ward, 38; 2d ward, 53; 3d ward, 90; 4th ward, 73; 5th ward, 25; 6th ward, 32; 7th ward, 61; 8th ward, 9; 9th ward, 72; that the act of the legislature above recited was not applicable to the city of Milwaukee; that at the special meeting above described not over three hundred persons met at nine o'clock, A. M., at the common council room; that no proposition to determine the purposes for which said sum of $120,000, proposed to be voted, should be used, and how much should be devoted to each purpose, was adopted; that those present in favor of imposing the tax, being some two hundred, were in a majority; that thereupon inspectors were chosen; and that no other acts were done or proceedings had at the meeting than are stated in the records of the proceedings of the meeting, filed with the city clerk, and a copy of which is attached to the complaint, [and the substance of which is above stated]. The complaint further avers that the city of Milwaukee contains fifty thousand inhabitants, and eight thousand legal voters; that the City Hall, where the meeting was held, is not capable of holding more than one thousand persons; that for the purpose of taking said

vote, but one poll was open in the entire city, to wit, said poll in the common council room, and that it would be absolutely impossible to take the votes of one half the legal voters of said city at a single poll between the hours of nine, A. M. and five, P. M. The plaintiffs insist, therefore, that the proceedings of said meeting furnish no warrant to the common council or any of the officers of said city to do the acts hereinbefore mentioned, and which are sought to be restrained. The complaint further avers " that many of the residents of the different wards in said city have well discharged their duties as citizens, under said act of Congress; some have responded to previous calls of the President, and have served their term in the field; others have contributed large sums to furnish bounties for volunteers who have been credited to their respective wards, and aid and support the families of volunteers and of drafted men; others have paid large sums of money for substitutes; and yet, under color of said act of the legislature, and the authority of the said mass meeting, the officers of the city claim the right to compel the payment of the said sum of $119,000 by the levy of a tax upon all the taxable inhabitants and property in said city, for the purpose of enabling some residents of the wards to avoid the duties imposed upon them by law." It further avers that the annual assessment roll of real and personal property in the city of Milwaukee was made in June, 1864; that since that time there have been great changes in both real and personal property, &c., &c.; and that at this time no fair and uniform tax can be levied on that assessment roll.

In the action of *Porter* against *The City of Milwaukee and others*, the complaint, in addition to the facts relied upon in the other action, alleges that the plaintiff is a resident of the *fifth ward* of said city, and the owner of certain real estate in that ward; and that "no part of said sum of $119,000, so appropriated and levied by the common council, will or can be used to fill the quota of said fifth ward * *, and no part thereof

will or can be used to refund the moneys so paid as bounty to the men furnished upon and for the quota of said ward, or any part thereof, to those who contributed the same, except, perhaps, the sum of two hundred dollars, for which, the last man so mustered and credited to said ward gave to the committee who paid him his said bounty an order on said city." It also alleges that said plaintiff is "thirty-four years of age, and was liable to enrollment and to render military service under [said act of Congress], and was enrolled as such in said fifth ward in August, 1864, and would now be liable to be drafted in said ward if he had not procured his exemption therefrom as provided by said acts;" that being so enrolled, for the purpose of procuring his exemption from such liability, he, on the 25th of August, 1864, furnished a substitute who was received and mustered into the service of the United States, for whom he had paid $625; and that he was therefore, under the law, exempt from draft for three years, &c.

Upon these complaints, duly verified, the court granted orders upon the defendants to show cause why an injunction should not issue as prayed for; whereupon *George G. Dousman*, clerk of said city, filed an affidavit stating the presentation to him of said petition and the proceedings thereupon as above described. After a hearing, the court denied the motions for an injunction; and from these orders the plaintiffs appealed.

*Thomas L. Ogden, N. J. Emmons* and *Joshua Stark*, for the appellants:

[Each of the counsel for the appellants filed an able and elaborate brief. On the particular questions passed upon by the court, selections have been made from *Mr. Stark's* brief, that being quite full and exhaustive upon those points.]

I. The act of February 2d, 1865, is unconstitutional and void. 1st. The taxes thereby authorized are not for public purposes. The power of taxation under republican government is not unlimited. Though it may not be restricted by any express provision of the constitution, it is still limited by its own na-

JUNE TERM, 1865. 635

Brodhead et al. vs. The City of Milwaukee et al.

ture and by the spirit of the institutions, of which the constitution is but an expression. Two propositions are fundamental: that taxes can only be raised for public purposes, and that the purposes termed public must relate to the public interests of the territory, or body of persons within the limits of the municipality in which the tax is raised. Our constitution has added the requirement that "the rule of taxation shall be uniform."

"The word *taxes* means burdens, charges or impositions, put or set on persons or property for public uses; and this is the definition which Lord Coke gives to the word talliage (2 Inst., 532); and Lord Holt, in Carth., 438, gives the same definition, in substance, of the word *tax.*" *Matter of the Mayor &c. of New York*, 11 Johns., 80. "Taxation exacts money, or services, from individuals as and for their respective shares of contribution to any public burthen." *People v. Mayor &c. of Brooklyn*, 4 Comst., 423. "The legislature has no constitutional right to create a public debt, or to levy a tax, or to authorize any municipal corporation to do it, in order to raise funds for a mere *private* purpose. No such authority passed to the assembly by the general grant of legislative power. This would not be legislation. Taxation is a mode of raising revenue for *public* purposes. When it is prostituted to objects in no way connected with the public interests or welfare, it ceases to be taxation and becomes plunder. Transferring money from the owners of it into the possession of those who have no title to it, though it be done under the name and form of a tax, is unconstitutional for all the reasons which forbid the legislature to usurp any other power not granted to them." Black, C. J., in *Sharpless v. Mayor &c. of Phila.*, 21 Penn. St., 168. "Taxes are defined to be rates or sums of money assessed on personal property of citizens by government, for the use of the nation or state; or, as the government sometimes exacts from individuals services as well as money, a more enlarged and correct definition would be, that they are burdens

or charges imposed by the legislative power of a state upon persons or property for public uses." Dixon, Ch. J., in *Knowlton v. Rock Co.*, 9 Wis., 418.

"The remark that every wholly independent government has authority to lay taxes in its discretion, when applied to a constitutional or republican government, is of course to be understood with the qualification, that they are to be imposed to subserve the legitimate ends of taxation, viz., to defray public charges and expenses, and by general or public laws equally binding on every member of the community or for which they are levied." Ch. J. Dixon in *Lumsden v. Cross*, 19 Wis., 284–5. *Soens et al. v. Racine*, 10 Wis., 280. See also *Foster v. Kenosha*, 12 Wis., 620 ; *Hasbrouck v. Milwaukee*, 13 Wis., 43.

The other proposition is equally plain. This court in *Hasbrouck v. Milwaukee*, 13 Wis., 43 and 44, sustains the " power of municipal corporations when authorized by the legislature, to engage in and promote works of internal improvement, such as the building of railroads, canals, harbors and the like," upon the ground that they afford facilities for trade, commerce and inter-communication and add greatly to the general business, the commercial prosperity, and the pecuniary resources of the inhabitants of the cities, towns, villages and rural districts through which they pass, and say : " It is in view of these results, the public good thus produced, and the benefits thus conferred upon the persons and property of *all the individuals composing the community*, that courts have been able to pronounce them matters of public concern, for the accomplishment of which the taxing powers might lawfully be called into action. It is in this sense that they are said to fall so far within the purposes for which municipal corporations are created, that such corporations may engage in or pledge their credit for their construction. Upon no other principle can the exercise of the power of taxation for such objects be sustained. And in doing so the courts have *never*, to my knowledge, *ex-*

*tended it to cases where it was not apparent that the members of the corporation concerned would be benefited by the construction of the* work contemplated." So in *Bank of Rome v. Rome,* 18 N. Y., 43, the Court of Appeals, JOHNSON, Ch. J., affirm the proposition " that the powers conferred on a municipal corporation must relate to the public interests of the territory, or body of persons within its limits." The vital principle is " local taxes for local purposes, and general taxes only for purposes which concern the whole state." The city of Janesville may be authorized to raise money by taxation to construct water works for the convenience of its inhabitants. This would be a public purpose to Janesville and to its inhabitants, and therefore lawful. But " the state could not construct water works for that city " (*Bushnell v. Beloit,* 10 Wis., 226); neither could the expense thereof be charged upon Madison; neither the inhabitants of the state at large, nor the inhabitants of Madison have such an interest in the local improvements of Janesville, that they may be taxed to make them.

It is equally true that the common and general burdens of the state cannot be cast upon one or more counties, nor those of a county upon a single town or city, nor those of a whole city upon a single ward thereof. So a local tax levied in Milwaukee to clothe and pay Sherman's army could not be valid; neither could a like local tax be sustained for the payment of the legislature of Wisconsin, or for the construction of a court house and jail in the county of Racine. The burden of paying and equipping the federal armies, belongs to the nation. The expenses of the state government must be shared by the whole state; and each county and city must provide the means for its own local improvements. This principle is involved in the idea of taxation, and when it is disregarded, it is the duty of the courts to interfere to prevent the injustice and oppression which will certainly follow.

By the constitution of the United States, Congress has power to declare war; to raise and support armies; to provide

and maintain a navy; to make rules for the government and regulation of the land and naval forces; to provide for calling forth the militia to execute the laws of the Union, and suppress insurrection and repel invasion; to provide for organizing and disciplining the militia, and for governing such part of them as may be employed in the service of the United States; and to make all laws which shall be necessary and proper for carrying into execution the foregoing powers, &c. The power of Congress in the premises is supreme, and includes the power to prescribe what class of citizens shall be subject to military duty and to command their service in the national armies, subject only to the duty of compensation. In the exercise of these powers, Congress, on the 3d of March, 1863, passed "an act for enrolling and calling out the national forces, and for other purposes." By this act and the amendments thereto, particularly one approved February 24th, 1864, all the able-bodied male citizens of the United States, and persons of foreign birth, who shall have declared their intention to become citizens under and in pursuance of the laws thereof, between the ages of twenty and forty-five years (except as in said laws excepted), are declared to constitute the national forces, and be liable to perform military duty in the service of the United States when called out by the President for that purpose. For convenience in enrolling, calling out and organizing the national forces, &c., each congressional district was provided with a provost marshal, surgeon, and commissioner, constituting the board of enrolment for such district, and each ward of a city, town, township, precinct or election district was made a sub-district, the residents whereof subject to military duty were to be separately enrolled, and whenever men were called for by draft for the military service, quotas were to be assigned to these sub-districts in the proportion of the number enrolled therein. Thus the burden was equalized and distributed. Congress also provided for the clothing, rations and pay of all the national forces, and, to induce voluntary enlistments, pro-

vided liberal bounties for those who should enlist, proportioned to the term of enlistment. By the act of 1864, they also provided that any person enrolled and liable to military service, might, before a draft, furnish an acceptable substitute, who should not be liable to draft nor then in the service, and thereby become exempted from the draft for the term of enlistment of such substitute. A drafted man might also furnish a substitute for himself, and so obtain his own release from service. The act of 1863, until amended, permitted a person drafted to furnish a substitute, or to commute by paying a sum not exceeding $300 to the government "for the procuration of a substitute."

These and other provisions of these acts of Congress show that they were framed to reach the citizen or subject directly. The national government claims the personal allegiance and support of every citizen, and by this legislation enforces such allegiance, by exacting his personal service in the national armies. It is an exercise of the taxing power in its broadest sense. The service required is however strictly personal. The national government enrols, enlists, drafts, exempts, and in all its operations under these laws, deals with individuals only. The only obligation recognized and enforced is individual. No one but the individual or some one in *his* stead can discharge his obligation. The obligation to render military service is as personal as that to pay taxes or to perform any other duty which may be required by the government.

The volunteers or drafted men who may be credited to the several wards of the city, enter the exclusive service of the United States, by whom they are paid, controlled and discharged. The city is under no more obligation legal or equitable to pay the soldiers who enter the service of the United States and become credited to the quotas of its wards, either as volunteers or drafted men, than to pay the soldiers of Illinois or Maine. They are not the soldiers of Milwaukee, but of the nation. They all enter a common service, are subject to

one common authority, receive a common and uniform reward, and fight shoulder to shoulder the common battles of our country. In what view, then, will taxation to pay these bounties be justified? Is its object, to fill up the national armies and put down rebellion? That is not a matter of local or municipal duty or concern. It belongs to the whole nation. Is it to furnish the quota of the city under the President's call? The city has no quota—quotas are assigned to wards; neither is any duty or obligation laid upon the city or its wards to furnish men or to fill their quotas. The duty of enlistment and service is not a corporate duty affecting all the members of corporation, but a personal duty, affecting only those who are designated as liable to do military service. All bounties to such persons, or to relieve such persons, are therefore mere gifts or gratuities. Is it to prevent the suffering and distress supposed to be incident to a draft? The relief of want and suffering is acknowledged to be a proper purpose of taxation, upon the basis of charity. But how does it appear that a draft will produce such results? Are they necessary or only possible or accidental results? If the latter, is not the duty as well as power of the municipal authorities limited to the alleviation of suffering, distress and want whenever and wherever found? Is it to shift the burden from those on whom it is laid by Congress, to those whom Congress has exempted, and those who have already borne and discharged their full share of the burthen? What can be greater injustice, than to compel those who are exempt from military duty, by reason of age, infirmity or sex, those who are in the service, or have served their term and have been discharged, and those who have heretofore procured their own exemption by furnishing substitutes, to contribute to help *others* escape a duty and service, justly, because lawfully, imposed on them? As well might the city raise money by tax to pay judgments against certain individuals, or to pay their individual taxes, or to discharge for them, or to aid in discharging, any other legal obligation. I

Brodhead et al. vs. The City of Milwaukee et al.

can regard the the act of February 2d only as authorizing money to be raised by general tax, to be donated to A. and B. for their own benefit, without legal or moral obligation to induce the gift, and without equivalent of any kind being returned. What sort of claim have men who enlisted before the passage of this act, without reference to its provisions, to be paid bounties by the city? What propriety can there be in voting the sum of two hundred dollars as a gratuity to a man who has not entered the service, but has purchased a substitute, and secured his own exemption? If taxes may be voted for such purposes, to be distributed to individuals without equivalent, why may not money be raised by tax for the purpose of paying every poor man $500? If the right of taxation to pay gratuities is upheld in any case, what shall be the limit to the exercise of the right short of a general distribution of property on agrarian principles?

It has not often happened that legislatures have attempted to authorize taxation for other than legitimate purposes; and few cases, therefore, are reported determining for what purposes taxation *cannot* be authorized. The cases have generally arisen from attempts by municipalities to raise money for purposes not authorized by the laws creating them. It has however occurred that the discussion necessarily embraced questions of legislative as well as municipal power. A few such cases will be referred to.

At a legal meeting of the inhabitants of the town of Biddeford, in Maine, on the 4th day of April, 1837, a vote was passed to receive the money apportioned to the town under the act of the 8th of March, 1837, entitled "An act providing for the disposition and repayment of the public money, apportioned to the state of Maine, on deposit, by the government of the United States," and that the money so received should "*be divided among the inhabitants of the town according to families.*" The act of the legislature apportioning the money authorized the town to appropriate its portion thereof "for the same purposes

that they have a right to any moneys accruing in the treasury from taxation," also to loan the same, &c. In an action by an inhabitant of the town, having a family, to recover his share of the money voted at the town meeting, the supreme court of Maine (SHEPLEY, J.) say. " The case presented by the vote can be regarded only as a donation of the money to the 'inhabitants of the town according to families.' By a division according to ' families ' must be understood a division *per capita*, or by numbers; *. *. If towns cannot legally grant, assess and collect money, and when it has been received divide it by donation among the families according to numbers, then the money received under the act of the 8th of March cannot be so divided; because the appropriation of it is restricted by the act to ' the same purposes that they have a right to any money accruing in the treasury from taxation.' To contend that towns have the power to assess and collect money for the purpose of distributing it again according to numbers, is to ask for a construction, not only entirely unauthorized by the language of any statute, but in direct opposition to the language of limitation employed in giving power to the towns to grant money. It not only does this, but it asks the court to give a construction to the statutes which would authorize towns, if so disposed, to violate ' the principles of moral justice.' For if the right to assess and collect money is without limit, it would not be difficult to continue the process of collection and division until the whole property held by the citizens of the town, had passed into and out of the treasury, and until an equalization of property had been effected as nearly as it could be expected to be accomplished by placing it all in one common fund, and then dividing it by numbers, or *per capita*, without distinction of sex or age. Such a construction would be destructive of the security and safety of individual industry and exertion. It would authorize a violation of what is asserted in our declaration of rights to be one of the natural rights of men, that of 'acquiring, possessing and protecting property.' *Such*

a construction would authorize a violation also of that clause in the constitution of this state, which provides that 'private property shall not be taken for public use without just compensation nor unless the public exigencies require it.' No public exigency can require that one citizen should place his estates in the public treasury for no other purpose but *to be distributed to those who have not contributed to accumulate them, and who are not dependent upon the public charity.*" *Hooper v. Emery*, 2 Shepley, 375.

At a legal meeting of the inhabitants of the town of Fairhaven, Mass., held August 2d, 1814, it was voted to raise $1200, "*for the payment of additional wages allowed the drafted and enlisted militia of said town*, and other expenditures of defence." At that time open war existed between the United States and Great Britain. The enemy were upon the coast, in sight of the town, and had made an attempt to land. They were then laying waste and destroying the dwellings and other property of the people along the coast, and the town was immediately exposed to their ravages; the inhabitants deemed the necessity great and urgent, for their own immediate protection and defense, and the tax was voted unanimously. The supreme court of Massachusetts, in *Stetson v. Kempton et al.*, 13 Mass., 272, held the tax unauthorized and void. Ch. J. PARKER, giving the opinion of the court, says: " The case before us is that of a tax founded upon a vote of the inhabitants to raise money for the purpose of giving additional wages to those of the inhabitants who should be called, as militia men, to do duty in pursuance of lawful authority. Now to furnish the quota of militia is no part of the corporate duty of a town, or to pay them. The militia are drafted from those divisions and sub-divisions of the citizens which are established by law, without regard to the territory or jurisdiction of towns; and provision is made by law for the payment of such as may be called into actual service. To give additional wages, in order to encourage such as may be drafted, may evidence the sense

of danger and the patriotism of a town, but it does not fall within any duty imposed by law ; and it is not certain that it would produce any valuable end. For instead of a uniform and equal payment of all those who, in other respects, are on a footing of equality, it would probably cause jealousies and dissensions, which might be highly injurious to the public service. At any rate, such a tax can, in no view, be considered as laid for the discharge of necessary town charges. For no necessity of incurring the expense exists ; and the additional compensation intended is nothing more than *a gratuity or bonus, which may well come from individual bounty, but cannot be the subject of legal exaction.*"

In July, 1863, the justices of the supreme court of Maine were required by the governor of that state to give an opinion whether the towns or cities of the state could lawfully raise money by taxation to pay to the United States the commutation of $300 then allowed, for such of their inhabitants as might be drafted. In an opinion, signed by all the judges and published in the American Law Register for August, 1863, (p. 623), they say : " As Congress has the power to require and command the services of each citizen, so it may prescribe the mode and manner for obtaining such services. The obligation of obedience rests upon the citizen. It is part of the duty he owes the government which protects his rights. The duty is personal—that of each citizen. If drafted, the service must be his personal service. If a substitute is procured, ' the procuration of such substitute' is to be made by the person drafted. If commutation money be paid, he is to make such payment. True, a friend may volunteer as a substitute, or may aid in procuring the money to pay whatever sum may be determined upon by the secretary of war as the price of exemption, as he may aid him in discharging any other personal liability. But the liability to serve, to procure a substitute who shall be accepted, or pay the sum fixed as a commutation, are all none the less

personal duties and liabilities. They are as much personal liabilities as the obligation to pay a tax duly assessed, to discharge a debt due, or to perform an act the performance of which is imposed by contract or by statute. It will be perceived, then, that the question amounts to this, whether a town can legally raise money, gratuitously to discharge the pecuniary obligations of its citizens, or to procure their exemption from military or other service." The answer of the judges to this question is an unqualified negative, both for want of legislative authority, and because the money was proposed to be raised for purely private ends. Appended to this opinion in the Law Register is a note by the late Ch. J. REDFIELD of Vt., earnestly supporting the proposition as admitting of no doubt, that "municipalities of the states have no power to impose taxes, either to raise or to prevent raising troops for the service of the national government."

.If the views expressed in the several opinions cited are correct, there can be no ground on which to sustain the act of February 2d, or the proceedings in Milwaukee under said act.

The sum of $119,000 was voted for all the purposes authorized by the act, without apportionment of the amount, and the resolutions levying and appropriating the amount make no apportionment. It follows, therefore, that if a tax for any one purpose mentioned in the act would be unconstitutional and void, then the whole tax so voted in Milwaukee, and all the proceedings had under the law, must be void. The court cannot divide up the amount voted, and assign any definite portion thereof to one of the purposes mentioned.

2d. The act of Feb'y 2d, 1865, conflicts with the act of Congress before referred to, and under sec. 2 of art. 6 of the constitution of the United States, is void. Congress has power to declare war, to raise and maintain armies for the national service, to raise revenues for the support of the national government, and to make all necessary and proper laws for carrying into effect these powers. It follows that Congress may and

must prescribe who shall be liable to military service, and who shall be exempt therefrom, and also the mode and manner of obtaining those services. It may also apportion the burthens of taxation for revenue. "The power of taxing and the power of apportioning taxation are identical and inseparable. Taxes cannot be laid without apportionment." 4 Comst., 427. In the exercise of its power of taxation, whether exacting personal service or money, Congress within its jurisdiction is supreme. Not only the extent but the apportionment and distribution of those burdens laid upon persons and property for national purposes, are to be determined exclusively by the national legislature, whose judgment and discretion in the premises is absolute, except as controlled by the constitution of the United States. Congress has made this apportionment of burthens by its conscript and revenue laws, and has designated what persons or class of persons shall bear the particular burthen of military service. The act of the legialature is an attempt to change this distribution of the public burthens, and to shift that of military service from those on whom Congress has laid it, and cast it upon property, to purchase their exemption from such service. Can the legislature do this? It certainly cannot enlarge the class composing the "national forces," nor add to the number of those liable to military service under acts of Congress. Can it practically do the same thing by taxation, compelling all who own property to contribute to relieve from military service those subject thereto? Why may not the same relief be extended to those from whom Con·gress *exacts money* by the *revenue* laws? Is there any difference in principle? Is the apportionment of taxation for revenue by Congress more absolute and less liable to be modified by state legislation, than its apportionment of taxation in exacting personal service?

3d. Counsel also contended that the power of determining the amount and objects of taxation is a *legislative* power (*Knowlton v. Rock Co.*, 9 Wis., 418; *Weeks v. Milwaukee*, 10 id., 257;

*Lumsden v. Cross*, id., 284–5), and that the act in question was void because it undertook to vest this power in the *electors*. *Barto v. Himrod*, 4 Seld., 483 ; *Parker v. Commonwealth*, 6 Barr, 507; 10 Cal., 402; *Bank of Chenango v. Brown*, 26 N. Y., 467; 18 N. Y., 38; 23 id., 439, 45%. 4th. Counsel argued that the act, as applied to municipal corporations, was unconstitutional, because it imposed no restriction upon the power of taxation for the purposes mentioned therein ; allowing the electors to raise such amounts as they might deem necessary, and for an unlimited number of beneficiaries ; the clause relative to the families of volunteers and drafted men not containing any restriction to the volunteers &c. of the district raising the tax. Const. of Wis., Art. XI, sec. 3 ; *Foster v. Kenosha*, 12 Wis., 616.

II. The act does not apply to the city of Milwaukee. 1st. Because the city has no quota, and can have none under the acts of Congress. Quotas are apportioned to towns, *wards* of cities, precincts, election districts &c. and these divisions or sub-districts as they are called, are, for all purposes of enroll- ment, assignment of quotas, drafting &c., wholly distinct and independent. Two wards have no more interest or concern in common, under the law, than two towns. The act of the legislature authorizes the payment of bounties to volunteers and men procuring substitutes who shall be " credited to such city." To give effect to the obvious import and design of this language, the word city must be understood as meaning a sin- gle corporate body, so capable of receiving credits for volun- teers that the benefit therefrom, if any, shall be general and co-extensive with its limits. This is clearly impossible in cities embracing several wards. A volunteer credited to a single ward, cannot be said to be credited to the city, within the meaning of this act. Such a construction would destroy the justice and equity of the tax. The essential purpose of the act evidently was to make the benefits conferred co-exten- sive with the burthens imposed; in other words, to provide

that all who should be taxed for the payment of bounties, should be alike benefited by the credits procured, in the way of prevention of a draft. It is inconceivable that the legislature should intend to make wards whose quotas are nearly filled, pay bounties to aid other wards to fill up, which are much farther in arrears. It would be as fair and just to provide for a common tax for bounties upon two or more towns, as upon nine wards of the city, which will be so differently benefited by the use of this money. It is well known that in assigning the quotas under the call of December 19, 1864, any excess of credits due to any ward or other sub-district, for men before furnished, was taken into the account, so that the respective quotas were neither proportioned to the the total population, nor to the number of men enrolled in the several sub-districts. The fair construction and meaning of the act I take to be this, that the qualified electors of such towns, cities or incorporated villages to which quotas are or may be assigned, and credits given, under the calls of the president, may raise money, &c. ; and this excludes Milwaukee from the terms of this act. 2. The act in terms applies only to towns, cities and villages whose local affairs and interests are considered and managed by the electors, at meetings thereof held for the transaction of the public business annually, and at other times as provided by law, as in towns. It provides that the electors, &c., " shall have power at any *annual or special meeting thereof*." The entire scope of the act would seem to be merely to enlarge the powers of the electors of towns, cities and incorporated villages at their annual or special meetings, and to provide a more summary and convenient mode of calling and holding such special meetings for the specific purposes of the act, and of carying out the determination of the electors thereat. But the electors of Milwaukee do not and cannot hold such meetings, either annual or special. They vote in their several wards, at annual and special *elections*. But the electors of the whole city, some 8,000 in number, cannot possibly meet together in

one place for discussion, deliberation, and the transaction of the public business as in towns ; and the court will not convict the legislature of the absurdity of intending to include such a city within the provisions of the act, unless the language abso-lutely compels it. 3. Counsel contended at length that the minor details and machinery of the law showed that it could not be applied to a city like Milwaukee. 4. A further reason for holding the act inapplicable is found in section 43, ch. X, of the city charter : " No general law of this state, contravening the provisions of this act, shall be considered as repealing, amending or modifying the same, unless such purpose be ex-pressly set forth in such law." The act of 1865 contravenes the provisions of the charter as to the time and mode of levy-ing and collecting taxes in the city, and as to the objects thereof.

III. If the act in question is held to be constitutional and applicable to Milwaukee, the proceedings under it are void, because not authorized by its terms. The act authorizes the payment of bounties to volunteers &c., who shall be credited *to the city* on *its* quota. But the bounties and the tax therefor in this case were voted for men credited to the city *or any ward thereof,* and the resolutions of the council direct the pay-ment of bounties in accordance with such vote. " Where, as in this case, the language of the legislature is clear and une-quivocal, it is not for the courts to extend the operation of a statute to any subject not embraced in it." *Ogden v. Glidden,* 9 Wis., 51–53.

*Jas. G. Jenkins,* City Attorney, to the point that the state legislature is restricted in its power only by the federal and state constitutions, cited *Clarke v. Rochester,* 24 Barb., 446 ; *Guilford v. Chenango Co.,* 3 Kern., 143 ; *Sill v. Corning,* 15 N. Y., 297 ; *People v. Draper,* id.,. 532, 549 ; *Bank of Rome v. Rome,* 18 N. Y., 38 ; *Brewster v. Syracuse,* 19 N. Y., 116 ; *Leg-gett v. Hunter,* id., 445 ; *Tallman v. Janesville,* 17 Wis., 77 ; *Clark v. Janesville,* 10 id., 136 ; *Bushnell v. Beloit,* id., 195.

Unless it is apparent upon the face of the act that it is utterly devoid of any public purpose, it is valid. The *quantum* of public interest is not a question for courts to determine. *Sharpless v. The Mayor of Philadelphia*, 21 Pa. St., 172 ; *Thomas v. Leland*, 24 Wend., 65 ; *Morris v. The People*, 3 Denio, 381 ; *People v. The Mayor &c., of Brooklyn*, 4 Coms., 419 ; *Brewster v. The City of Syracuse*, 19 N. Y., 116 ; *Guilford v. Supervisors of Chenango Co.*, 13 N. Y., 143. Counsel further argued that the objects sought to be accomplished by the act in question are of public concern ; because thereby the armies of the Union are replenished, and the government aided in its attempts to suppress insurrection ; because in sustaining the government the liberties of the people are protected, and the blessings of free government perpetuated ; because the property of every tax payer is thus protected, and he defended in its enjoyment ; because the mechanics and artizans of the city being protected from the hardships of a compulsory draft, industrial and mechanical pursuits are thus fostered and sustained ; because support is provided for the families of volunteers and drafted men, and temptation to crime and a dissolute life, superinduced by want, is removed ; because general suffering consequent upon the enforcement of a draft is avoided, and riots and destruction of property prevented ; and because the good name and credit of the city is maintained, and emigration induced and encouraged, and not repelled.—To the point that an act of the legislature should be declared void only when it clearly and palpably violates the constitution, counsel cited *Cooper v. Telfair*, 4 Dallas, 14 ; *Fletcher v. Peck*, 6 Cranch, 87 ; *Ogden v. Saunders*, 12 Wheaton, 270 ; *Derby Turnpike Co. v. Parks*, 10 Conn., 522 ; *Sharpless v. Mayor of Philadelphia*, 21 Pa. St., 164 ; *Adams v. Howe*, 14 Mass., 345 ; *Wellington et al., Petitioners &c.*, 16 Pick., 95 ; *People v. Orange Co.*, 27 Barb., 575, 586, 593 ; *Ex parte McCollum*, 1 Cowen, 450 ; *Cochran v. Van Surlay*, 20 Wend., 365, 381 ; *The People v. Foot*, 19 Johns., 58 ; *Morris v. The People*, 3

Denio, 381, 394; *Clarke v. Rochester*, 24 Barb., 471 (affirmed by the Court of Appeals, March, 1864); *Bepley v. State*, 4 Ind., 264; *Dickson v. The State*, 1 Wis., 122.   Counsel also contended that the cases from Maine and Massachusetts cited for the appellants, do not reach the point at issue, but merely decide that the municipal authorities had no power to levy taxes for the purposes there mentioned, under the then existing laws of those states.    To the point that the act did not delegate legislative power to the people, he cited *Corning v. Greene*, 23 Barb., 33; *Clarke v. Rochester*, 24 id., 446; *Bank of Rome v. Rome*, 18 N. Y., 38; *Starin v. Genoa*, 23 N. Y., 439; *Gould v. Sterling*, id., 456; *Bank of Chenango v. Brown*, 26 N. Y., 467; *Moers v. Reading*, 21 Pa. St., 188; 21 Ohio, 77. The law is applicable [to the city of Milwaukee.    1. It does not repeal, amend or modify the charter, but simply confers an additional power for a particular purpose.    2. Sec. 23, ch. 10 of the charter is invalid.    *Kellogg v. Oshkosh*, 14 Wis., 523. 3. The quota of the city is the aggregate of the quotas of the several wards.    The legislature properly treated the municipal corporation "in entirety" as a political division of the state.

*By the Court*, DIXON, C. J.    The argument was able and exhaustive, and left nothing for research or suggestion on my part.    I was convinced at the time, and so expressed myself to my associates, that the unconstitutionality of the tax could not be maintained.    I thought the act valid in every particular, and my convictions have since been confirmed by the opinions of the highest courts of two of our sister states upon the direct question.    One of those opinions was not then published, and both have but very recently come to hand.    I refer to *Booth v. Woodbury*, in the supreme court of Connecticut, Law Rep., June, 1865, p. 232 ; and *Speer v. Blairsville*, in the supreme court of Pennsylvania, Am. Law Reg., Sept. 1865, p. 661 [50 Pa. St., 150.]   I shall avail myself to a considerable extent of those opinions as expressive of my own views of the law.

Counsel on both sides accept as correct the principles laid down in the great leading case of *Sharpless v. The Mayor &c.*, 21 Pa. St., 147, 168, upon the subject of taxation. The same principles have frequently been affirmed by this court. The legislature cannot create a public debt, or levy a tax, or authorize a municipal corporation to do so, in order to raise funds for a mere private purpose. It cannot in the form of a tax take the money of the citizens and give it to an individual, the public interest or welfare being in no way connected with the transaction. The objects for which money is raised by taxation must be public, and such as subserve the common interest and well-being of the community required to contribute. To justify the court in arresting the proceedings and declaring the tax void, the absence of all possible public interest in the purposes for which the funds are raised must be clear and palpable—so clear and palpable as to be perceptible by every mind at the first blush. In addition to these, I understand that it is not denied that claims founded in equity and justice in the largest sense of those terms, or in gratitude or charity, will support a tax. Such is the language of the authorities.

I think the consideration of gratitude alone to the soldier for his services, be he volunteer, substitute or drafted man, will sustain a tax for bounty money to be paid to him or his family. Certainly no stronger consideration of gratitude can possibly exist than that which arises from the hardships, privations and dangers which attend the citizen in the military service of his country; and all nations have ever so regarded it. Who will say that the legislature may not, in consideration of such services, either directly or indirectly, or through the agency of the municipality or district to which he is credited, give to the soldier or his family a suitable bounty after his enlistment, or even after his term of service has expired? I certainly cannot. It is a matter which intimately concerns the public welfare; and that nation will live longest in fact, as well as in history,

and be most prosperous, whose people are most sure and prompt in the reasonable and proper acknowledgment of such obligations.

But the act provides for paying the same bounties "to persons who shall procure substitutes for themselves before being drafted, and have them credited to such town, city or village, upon its quota," under the then pending call of the president or any call which should thereafter be made; and it is said that clearly no debt of gratitude is due to such persons. To my mind it is not quite so clear. Suppose that during the late rebellion, citizens enough in the loyal states, liable to military service, had furnished substitutes so as promptly to have answered the calls of the president and kept the armies of the Union replenished with new soldiers, and so as to have avoided the evils and expenses of the drafts: is it clear that all the communities thus relieved would have been under no obligation of gratitude to such citizens? Suppose still further, that under the system of apportionment adopted by Congress, a sufficient number of such citizens had been found in any town, city or election precinct to have filled its quota by substitutes: would there have been no cause for thankfulness on the part of the inhabitants of such town, city or precinct for their having done so? I must confess that I think there would. War, though often unavoidable, is always a most deplorable public misfortune; and among its calamities, not the least, I may say the greatest, is the forcible separation of husbands, fathers, sons and brothers from their homes, kindred and friends, to be made bloody sacrifices upon the field of battle, or to die of loathsome diseases contracted in camps or upon campaigns; and those who avert the evil of such forcible separation, I care not from what motive of private or individual interest, so that the duty of furnishing men for the army is performed, cannot but be regarded as in some sense public benefactors.

But it is not for those who have furnished substitutes in the past that the act provides bounties, but for those who shall do

so under a pending call before being drafted, and have them credited to the town, city or village, so as to avoid or help to avoid an approaching draft. In such case the power to tax may not rest upon the ground of gratitude. It can be sustained upon consideration of the benefit accruing to the town, city or village from the credit, which is direct and palpable. The procuring of substitutes was lawful and proper in itself. The act of Congress authorizes it, and the credit to the town, city or village. Substitutes must be persons not liable to the draft, so as not to affect the interests of those who were, otherwise than by directly relieving them from the burden of it. The provision for substitutes was a necessity. Other obligations exist as strong, sometimes almost stronger than that of carrying arms in the public defense; and they could not be ignored. Some were so situated that personal service seemed impossible. Others might not go without greater loss to the community at home than gain to the public at large. The procuring of substitutes was, therefore, not only proper, but in many cases commendable. Persons procuring them performed their whole duty under the law. They furnished soldiers for the field, and relieved the communities in which they resided, the same as if they had themselves enlisted. So far as the public interest is concerned in being relieved from the draft, I can see no distinction between paying bounties to them and to those who volunteer. Both contribute in precisely the same degree to such relief. The error of counsel, I think, consists in looking exclusively to the motives of private advantage by which the persons were governed. That such motives existed and were most frequently the predominant cause of their procuring substitutes, will not be denied. But there is no public good without at the same time some private gain, and in the language of Chief Justice BLACK, it is enough that we can see any possible public interest in the act, or public benefit to be derived from it. All beyond that is a question of expediency

for the legislature, not of law, much less of constitutional law, to be determined by the courts.

Upon the general question, whether the payment of boun' ties to volunteers to fill quotas and avoid drafts is a public purpose so as to authorize state or municipal taxation, I quote from the opinion of the Pennsylvania court. " The power to create a public debt and liquidate it by taxation is too clear for dispute. The question is, therefore, narrowed to a single point: is the purpose in this instance a public one—does it concern the common welfare and interest of the municipality ? Let us see. Civil war is raging, and Congress provided, in the second section of the act of the 24th of February, 1864, that the quota of troops of each ward of a city, town, township, precinct &c., should be as nearly as possible in proportion to the number of men resident therein liable to render military service. Section 3 provides that all volunteers who may en list after a draft shall be ordered, shall be deducted from the number ordered to be drafted in such ward, town &c. Volunteers are therefore by law to be accepted in relief of the municipality from a compulsory service by lot or chance. Does this relief involve the public welfare or interest? The answer rises spontaneously from the breast of every one in a community liable to the military burden. It is given, not by the voice of him alone who owes the service, but swells into a chorus from his whole family, relatives, and friends. Military service is the highest duty and burthen the citizen is called to obey or to bear. It involves life, limb, and health, and is therefore a greater ' burthen' than the taxation of property. The loss or injury is not confined to the individual himself, but extends to all the relations he sustains. It embraces those bound to him in the ties of consanguinity, friendship and interest—to the community which must furnish support for his family, if he cannot ; and which loses in him a member whose labor, industry and property contribute to its wealth and its resources ; who assists to bear its burdens, and whose knowledge, skill and

public spirit contribute to the general good. Clearly the loss of that part of the population upon whom the greatest number depend, and who contribute most to the public welfare by their industry, skill, property, and good conduct, is a common loss, and therefore a general injury. These are alike subject to the draft. The blind and relentless lot respects no age, condition or rank in life. It is therefore clearly the interest of the community that those should serve who are willing, whose loss will sever the least ties, and produce the least injury."

" The bounty is not a private transaction in which the individual alone is benefited. It benefits the public by inducing and enabling those to go who feel they can best be spared. It is not voluntary in those who pay it. The community is subject to the draft, and it is paid to relieve it from the burthen of war. It is not a mere gift or reward, but a consideration for service. It is therefore not a confiscation of one man's property for another's use, but is a contribution from the public treasury for a general good. In short, it is simply taxation to relieve the municipality from the stern demands of war, and avert a public injury, in the loss of those who contribute most to the public welfare. This is the design of the law; and it is no answer to say that bad men have abused it. * * * * It is not the individual payment that tests the public character of the appropriation. Individuals are always the recipients of the public funds. It is paid to salaries, to pensions, to bounties for the scalps of panthers, wolves, foxes, crows and blackbirds, to the poor, to the education of the young, as rewards for the apprehension of horse thieves and felons, to the families of soldiers in the service, to aid hospitals, colleges, agricultural societies, and to other useful objects. In all cases the recipient is directly benefited, while the public interest in many is not half so imperious or acute as the relief of a community from an impending draft. * * The pursuit of happiness is our acknowledged fundamental right., and that, therefore, which makes a whole community unhappy is certainly a social

JUNE TERM, 1865.          657

Brodhead et al. vs. The City of Milwaukee et al.

evil, to be avoided if it can be.   The support of the poor affords
one of the best illustrations of what is a municipal or public
appropriation of money.   The pauper is the party directly and
solely ˙ benefited, while his pauperism is a public evil, and
often is the result of crime.   The pauper has not the merit of
the volunteer, while the community is injured, not benefited, by
his support.   There is nothing but a naked public duty per-
formed in his relief.   The same may be said of all expendi-
tures of public money in the punishment of crime.   *   *   *
If then it be within the scope of a municipal purpose to grant
pensions, pay bounties, give rewards for the destruction of
noxious animals, and the arrest of felons, employ watchmen,
support paupers, build almshouses, bridges and markets, aid
charitable institutions, make roads, and grade and pave streets,
at public expense, how much more is it a public affair, which
has for its object to prevent the forcible and blind extradition
of a valuable part of the population into a service dangerous
to the lives and limbs of those who go, and destructive of the
welfare and happiness of those who remain.   Nor can the
dilemma be avoided.   It is imposed by the exigency of war
and the duty of public defense.   *   *   *   *   In
the case before us the object is not to obtain money *for* the
*volunteer*, but for the community which is to be relieved by
the volunteer.   *   *   *   The consideration given
on his side is most valuable—he enlists into a dangerous ser-
vice, running the risk of life and limb ; and takes upon himself
the burthen resting upon the whole community subject to the
lot.   The public welfare, as I have already shown, is most in-
timately involved in the draft, which enters directly within the
field of municipal affairs.   The die is not cast, and the lot is
yet uncertain.   All are liable within the ages of the greatest
capability for usefulness.   The chosen may be the most valua-
ble, useful, and needed members of society, whose extradition
may produce the greatest injury and the most distress.   The
public interest is more involved in the ills of a draft, than in

many evils recognized as public in their nature. An obstruction to a highway and a disorderly house, perhaps hurtful to but few, are punished as public nuisances. Even sounds and smells claim public attention. An impending draft is an evil certainly more to be dreaded than the odor of a pig stye, or the clatter of horns. Can it be that citizens may be torn from the community and social ties ruptured, to drag them into a dangerous public service, and yet community cannot interfere to save them, on the ground that it is only a private affair? Their property may be protected from the storage of powder, by municipal regulations, but their bodies cannot be saved from being made food for powder in the public defense. It is possible to hold the disc of the dollar so close to our eyes, that it excludes from sight every object of public interest and blinds us to every sentiment of humanity."

This is fully to the purpose, and enough upon the question of municipal bounties to volunteers.

Another objection is, that the duty of service is personal, confined to the class named in the conscription, and that the residue of the people required to pay the tax have no interest in the question. This is as false in fact as it is in theory. We all remember the gloom and anxiety that pervaded all classes of community before the late drafts, and the rejoicing and happiness when the "quota was filled" and the draft avoided—not the happiness and rejoicing of those alone who were liable to the draft, but of thousands upon thousands of others connected with or dependent upon them in the manifold relations of life. It is idle to say that none but those within the ages of conscription were interested. And as to the theory that no others owe service, I answer, in the language of the court in *Booth v. Woodbury*, in which town bounties to drafted men were sustained, that every citizen is bound to take up arms, when necessary, in the defense of his government, not as a matter of strict law, but as an incident of citizenship. The selection of a class only, of a certain age, of whom that service

is to be immediately demanded in a particular case, although wise, is arbitrary, not based on any peculiar or special obligation resting upon the class, or their ability alone to render the service, or to render it with less pecuniary or social sacrifice, but on the wants of the government, and the supposed fitness of the class to subserve the purposes of the government with more efficiency than others. If all owe the service, and it is for the common good, and there is the usual provision that it may be rendered by substitute or commutation, it is not easy to see why men above forty-five years of age, if able-bodied may not be called upon, as well as those of less age. If not as able to endure the hardships of the field, they may answer equally well for garrison duty or as details ; and presumptively they are better able to procure substitutes, for they have more generally accumulated property, or received it by inheritance. If substitution is made an element of conscription, as it was by the law in question, the ability to procure a substitute may well be an element without regard to age ; and therefore, when all above a certain age are exempt, they are favored, and it is clearly equitable and just that they equalize the burden by bounties to those who volunteer or are drafted and serve, or by making provision for the support of their families. On this equity, as well as upon the other grounds named, rests the power of the legislature to provide by taxation for state and local bounties; and under the system of apportionments prescribed by Congress, by which each municipality, election district or county is assigned its proportion of men, it becomes preeminently local taxation for local purposes, according to the rule contended for by counsel.

But it is said that the act does not apply to cities,—that it is applicable only to towns and villages. Cities are expressly named over and over in almost every section, and the intention of the legislature to include them is so obvious that he who runs may read and understand. I shall spend no time upon this objection.

It is also said that the act is in conflict with the charter of the city of Milwaukee, and impracticable in its operation. I do not think that it is in conflict with the charter, or repeals or modifies it in any particular. The charter remains the same as before, and all the powers which then existed or could have been exercised under it still exist and may now be exercised. The act was a delegation of new and specific powers to the qualified electors of the city, with a specific mode of exercising those powers, and in no wise affects or abrogates the general provisions of the charter, unless it be in some particular or particulars contravening the special provisions of the act, of which none were pointed out. No one can doubt the power of the legislature to pass special acts for special purposes without infringing upon the operation of other general laws, or to except a particular class of cases from the provisions of a previously existing general law, without repealing such law. *Smith v. Hoyt,* 14 Wis., 252.

As to the act being inconvenient, injurious, or impracticable in its operation, on account of the large number of voters who might be assembled at one place on the day of election, I answer, that that is an objection proper to be addressed to the legislature, but not to this court. This court can, and, when properly presented, must deal with and determine questions of the power of the legislature under the constitution ; but it cannot lay its hand upon or interdict a statute, or arrest its operation, because such statute is either unwise, unjust or oppressive, there being no question of legislative power involved. The court is not the guardian of the legislative will, and cannot protect the people from the inconveniences or hardships of merely unwise or improvident enactments. The law may be very bad in the respect complained of, but as it was for the legislature to prescribe the time and manner of calling and holding the elections, so it is for the legislature to apply the remedy. And if the room at which the election is called is small, inconvenient, or inaccessible to large numbers, the elec-

tors, or a majority of those present, may adjourn to some other place where these objections do not exist, making public announcement thereof and causing proper notice to be given to voters who shall come afterwards. This power, I have no doubt, is always possessed by the electors assembled on such occasions, unless expressly taken away by statute. The electors have this right as a power incident to all corporations at common law, irrespective of statutory grant. *Chamberlain v. Dover*, 1 Shepley, 472 ; *People v. Martin*, 5 N. Y., 27 ; *Goodell v. Baker*, 8 Cow., 289.

It has likewise been suggested that the legislature is prohibited by sec 3, Art. XI of the constitution, from providing for an election at one common poll, such not being the usual course in cities, but that the votes must be taken in wards or other lesser subdivisions. The object of this section is obvious. It was to impose upon the legislature the duty of restricting the power of taxation, assessment, borrowing money, contracting debts, and loaning their credit, so as to prevent abuses in assessments and taxation on the part of cities and villages, and not to give the legislature power to organize cities and villages, nor to prescribe the form of such organizations. The power to organize cities and villages would have existed without such provision, and the section is entirely silent upon the form or mode of organization. It is a fundamental rule in the con struction of written constitutions, that we are to be governed by the purpose of the framers, and I do not see how any one can look upon the section and say from the language employed, that it was the intention of the framers to bind the legislature to any ancient or then existing form of organization. It is not often that constitutional conventions are engaged upon such trivial and unimportant matters of form, and the records of our convention do not show that any such question was up or discussed. I can see no object in such prohibition, and have always supposed, and still do suppose, that it was left in the largest sense to the discretion of the legislature to de-

termine when and how cities should be organized, who should be their officers, what their names of office, their powers, and how elected, &c., &c. I have always supposed, and still do, that the legislature has full power to change or modify the provisions of any of our city charters as it may deem wise or expedient, or to repeal them. Should the legislature to-morrow, or at its next session, repeal the charter of the city of Milwaukee, and throw the territory into the form of a town organization, so that all the electors must vote at one poll, would this court have power to arrest the operation of the act or declare it void? Such an act might be most unwise and imprudent in itself, and most injurious in its effects; but I hold that this court would have no power over it; and for the same reason I hold that we have no power over the present act.

It may also be suggested that section 26 of Art. IV of the constitution has some influence upon the question. My answer is that the persons there spoken of are those engaged in the service of the state. Our soldiers have been engaged in the service of the United States.

Another objection is, that it is a delegation of legislative power to the people. In reply to this I refer to *Oliver's Case*, 17 Wis., 681, and the authorities there cited.

Still another objection is, that the whole power of levying troops, organizing armies, fixing compensation, paying bounties, &c., resides in Congress, and that the states can take no action in the matter. This objection was urged and fully met in the Pennsylvania decision. If Congress has the power and may legislate to the entire exclusion of the states, which is very doubtful so far as state aid to the persons and families of volunteers or drafted men is concerned, still Congress has not done so. The act of February 24th, 1864, was framed with direct reference to such state and municipal aid, and the act of Congress and the act of the state, without the slightest repugnance or opposition, go hand in hand together for the more ready and perfect accomplishment of one common object. The

Brodhead et al. vs. The City of Milwaukee et al.

propriety and legality of such assistance are expressly recognized in the third proviso of the seventh section, and the second proviso of the twentieth section, of the act of Congress.

One more objection, and the last in the long catalogue which I shall notice, is that the legislature did not pursue the system of division fixed by Congress. The bounties should have been by wards to volunteers to be credited to the wards respectively, instead of by the city at large, to be credited to each ward. How this diminished the power of the legislature, or could control its action, is not shown. I think it is very difficult to perceive. The argument tends to show *an abuse* of power, or lack of wisdom on the part of the legislature, rather than a *total want* of power, which last is the only one that can be addressed to this court to defeat the operation of the act. It is said that the residents of one of the wards had filled or nearly filled its quota at the time the vote was taken, and that it would be unjust to tax them to fill the quotas of the other wards. This is somewhat low and selfish ground, but admit the apparent injustice; still, if the court can see and the legislature could see, within the principles above stated, that they had yet some possible interest in filling the quotas of the other wards, and the legislature saw fit to tax them for that purpose, the tax must stand. In a city like Milwaukee, where all the interests of the people, religious, moral, political, social and economic are so intimately connected and blended throughout, it is not difficult to perceive such interest; and hence I think the objection must fall. It seems to me that the system of congressional subdivisions, adopted for convenience, has really no influence upon the question, and that the legislature might have provided for bounties from the state at large, or, as was done in Pennsylvania and New York, in some instances, from counties, as well as cities and towns.

I think, therefore, that the orders refusing the injunctions should be affirmed.

COLE, J.—I concur in the opinion of the Chief Justice.

DOWNER, J.   These cases involve the validity of the bounty act, so called, of February 2d, 1865.

The first section of that act provides that "the qualified electors of each town, city, and incorporated village in the state, shall have power, at any annual or special meeting thereof, to raise by tax such sum or sums of money as they may deem necessary to pay bounties to volunteers who may have enlisted, or who may hereafter enlist, under the call of the President of the United States, of December 19th, 1864, for three hundred thousand men, and who shall hereafter enlist under any call of the President which may hereafter be made, and become credited to such town, city or village under such calls; and also to persons who shall procure substitutes for themselves before being drafted, and have them credited to such town, city or village upon its quota under any such call, and for the purpose of giving aid to the familes of volunteers and drafted men."

The electors of the city of Milwaukee voted to raise $119,-000 for the purposes mentioned in the first section of the act. It is contended that such tax is illegal on various grounds :

1. It is said that the power to raise and support armies is granted to Congress ; that after the volunteers have enlisted they are exclusively under the pay, control and management of the general government, and that a state, much less a city, has no right in any way to aid or obstruct the exclusive rights and power of the general government; that the state cannot even give the volunteer, *after* his enlistment, extra pay or extra bounties.   This doctrine, it is claimed, is sustained by the decisions of the supreme court of the Union in the cases of *Prigg v. The Commonwealth of Pennsylvania*, 16 Pet., 542, and *Sturges v. Crowninshield*, 4 Wheat., 122.   There might be some force to this objection were it not for the resolution of Congress, approved March 19th, 1862, which provides that if any state during the present rebellion shall make any appropriation to pay the volunteers of that state, the secretary of

war shall receive the same and make regulations by which such funds shall be applied to the specific purposes for which they may be appropriated by the states. This resolution, in our view, renders the position untenable.

2. It is insisted that the act is void because it delegates legislative power, and depends upon a vote of the electors. The line is too clearly drawn between an act which depends upon the vote of the people whether it shall be a law or not, and one which confers power upon officers or electors to raise money or not as they please by taxation, and is in force without a vote, to need any discussion. The former is void, the latter valid. Tho law in question is so clearly of the class of acts uniformly held valid, as to require no citation of authorities.

3. It is further objected that the taxes authorized by the act are not for *public purposes.* It was conceded on the argument that money cannot be raised under the forms of taxation for mere private purposes. Such is undoubtedly the law, and we need not stop to inquire whether this prohibition is contained in some constitutional provision, or is a fundamental principle of free government, though not in the constitution; or whether it is implied from the very meaning of taxation, which is, an exaction of money or services from individuals as their respective shares of any public burthen.

Is the raising of money to pay bounties to volunteers who shall enlist in the service of the United States a public purpose? The whole United States had an interest in putting down the rebellion. To put it down was a public benefit—a benefit to the Union—a benefit to each state—a benefit to every town, city and village. Here then is a public interest or benefit, in the largest sense of the term. It is sufficient to authorize a state to tax its citizens, or the United States to tax all their citizens. But is it not true that a city, to authorize a local tax on its citizens or their property, must have a *special local interest over and above what it has in common with the state or*

*United States?* We think it must. This principle underlies all those cases which decide that towns, cities, and counties might impose local taxes to aid in the construction of railroads, plank roads, canals and highways, to build court houses, jails and harbors, and make various other improvements of a public character. The improvements may be such that the whole state has an interest in them, and might levy a tax to make them on the people of the entire state. At the same time it is true that the particular locality or municipal corporation authorized to impose the tax has a special interest beyond the interest which is common to the whole state. In a case where a city imposes a tax to aid in the construction of a railroad, the road tends to facilitate and increase the commerce of the city, to add to its population and its wealth. And there are public advantages or purposes special to the city for which a local tax may be imposed. It was urged however on the argument, that *any public interest*—the interest which a city had in common with the entire state or the United States—was sufficient to authorize local taxation. In support of this position passages in the individual opinions of judges in certain cases were cited. But none of the cases themselves turned upon that point; and it is evident upon a careful examination of them that they sustain the doctrine that *there must be a special local interest* to sustain local taxation, and that the expressions apparently to the contrary must be considered as made with reference to the subject matter of the actions or the questions before the court, and when so considered have no such meaning as was given them, or are mere *obiter dicta*. One of the leading cases upon the subject of local taxation is that of *Sharpless v. The Mayor of Philadelphia*, 21 Penn. St. R., 147. That was a suit in which the main question presented to the court was, whether the acts of the state legislature authorizing the city of Philadelphia to subscribe to the stock of certain railroad corporations, each having its terminus in or near the city—and to issue the bonds of the city for the stock, were valid. If the city could

lawfully issue its bonds, it could impose a tax on its citizens to pay them.   The court decided that the city had a special local interest in the improvement, and could legally impose a tax to pay the bonds.   Chief Justice BLACK, in his opinion in that case, says : " For us it is enough to know that the city may have a public interest in them (the railroads), and that there is not a palpable and clear absence of all possible interest perceptible by every mind at first blush.   All beyond that is a question of expediency, not of law, much less of constitutional law."   This and similar expressions in one or two other cases, it is insisted, go to the extent of asserting the doctrine that any public interest, even that which a city has in common with the state or United States, is sufficient for local taxation.   But such was not the meaning of Chief Justice BLACK.   It requires but a slight examination of his opinion to see that there runs through the whole of it the idea that there was in that case, and must be to sustain local taxation, a special local interest. The same is true also of the other cases cited on this point.

If the interest which the city has in common with the whole state is sufficient to sustain or authorize a city tax, then the legislature might levy the entire state tax upon the property in a single city.   But this would contravene that clause in the constitution which provides that " the rule of taxation shall be uniform."

Had the city of Milwaukee any special local public interest in procuring the enlistment of volunteers, who should, after the offering or voting of the bounty, enlist and be credited on her quota or that of any of the wards of the city ?   If she had, it was because it was for her interest that her mechanics and business men, who are the lifeblood of the city, and her citizens who have families to support, should remain at home, and their places in the army be filled by other persons residing outside of the city limits, or by those within, not so necessary to her well being and prosperity.   Is it certain that the bounty offered would have the effect of filling the quota with persons

who were not citizens, or with those classes of citizens whose enlistment would be the least injurious to the city? Is it not certain that many (stimulated as well by patriotism as by the bounty offered) of the very classes which the interest of the city required should remain at home, would enlist; and that the cowards and the sneaks, the idle, the lazy and the vicious would avail themselves of the very bounty offered, and procure, by adding to it a few dollars more, substitutes for themselves from the classes which the interest of the city required should remain at home, and thus aggravate the evil intended to be remedied?

It is not very clear to my mind that the city had a special interest on which this tax can be based; still we are inclined to the opinion that it had. And if it had *any* such interest, then it is a question for the legislature and not for the court. If it is doubtful whether there is any such public interest, then the court cannot pronounce the law void. To do that the court must be able to clearly perceive that the city had no special local interest in raising the volunteers. It follows that so much of the act in question as authorized a tax to pay bounties to volunteers who should enlist *after the vote* to raise the tax, is valid. We are sustained in this view by the recent decision of the supreme court of Pennsylvania in the case of *Speer et al. v. School Directors of Blairsville*, Am. Law Reg. for Sept., 1865, p. 661. The case of *Booth v. The Town of Woodbury*, Law Rep. June, 1865, p. 232, although it is perhaps somewhat in conflict with some of the views I have take in this opinion, yet in the main point, the validity of the law of Connecticut ratifying an unauthorized vote of the town to appropriate six thousand dollars to be distributed among men who should be drafted to fill the quota of the town, rests, it seems to me, upon the same principle as that portion of our law authorizing bounties to volunteers who should thereafter enlist. The giving of such bounties to men who should be drafted would enable men with families, and such as the

interest of the town required should remain at home, to procure substitutes; and it would or might induce those without fami-lies, not to procure substitutes, but to serve themselves.

4. It is maintained with great earnestness that the city has no *special* interest to support a tax to pay bounties to volun-teers who had already enlisted when the act was passed, or who enlisted before the vote to pay bounties. The argument, in brief, by which this position is sustained is, that " the record shows that these volunteers enlisted at the solicitation of pri-vate associations, or as substitutes for individuals who paid them a far higher price than the bounty offered by the city. The complaint of *Porter* and affidavit of Wyman show that the fifth ward had filled its quota, and that the funds had been raised by a private association which paid a bounty of from $200 to $285 to each volunteer. The city only gives a bounty of $200. The city has no special public interest to pay a still greater bounty to these volunteers; if she has, how and in what does this interest consist? She is to derive no benefit from it which she would not receive without it. She is under no legal obligation to pay it, for she never made any contract to give them any bounty. There is no equitable claim to this bounty on the part of such volunteers, for no pledge before their enlistment was ever given, express or implied, that they should ever have it; they have performed no public services so that it can be given them as an expression of gratitude for services rendered ; for they may not have enlisted ten days or even one before the vote to pay the bounty. Such volunteer never faced the music of battle, or smelt the powder of an enemy. He had been ever since his enlistment within the peaceable state of Wisconsin, and perhaps had not even paced the beat of the sentinel, and may have been all the while under close guard for fear he would play, in common parlance, the bounty jumper. He has no claim by the way of charity, for he may be worth his thousands."

This reasoning is plausible. The answer given is also plau-

sible. It is said, if the city has a *special* interest on which to base a tax to pay bounties to volunteers who enlist *after* the vote to pay the bounty, on the ground and for the reason that they by enlisting confer a special favor upon the city, why is not the volunteer who *before* the vote enlisted, and thereby conferred a special favor upon the city, without any agreement for remuneration, entitled to the bounty? If there is a legal obligation in the one case, is there not a moral obligation in the other, or at least *gratitude*, on which to base this bounty? This argument assumes what, if true in any sense, is not strictly true, and the answer is not therefore satisfactory. The volunteer may have been of the class which the interest of the city required to remain at home; and if so, no favor was conferred upon the city by his enlistment. But if a favor was conferred, who conferred it, the volunteer who has received from a private citizen or association from two hundred to eight hundred dollars as a bounty for enlisting, or the citizen or association who paid him the bounty? If there is a debt of gratitude, and to pay which a tax may be levied, to whom is this debt due? To the citizen who paid his money, and was the moving or procuring cause of the enlistment, or to the volunteer, who may reside out of the limits of the city—may be a resident of Canada or a citizen of some of the govern; ments of Europe, and who was or may have been a mere hire ling, and acted in this matter without one patriotic impulse? There can be no doubt that the citizen or persons who paid the bounty must be regarded in such case or cases as the real cause of enlistment. But for the bounties by them paid, the volunteers might and probably would never have enlisted and been credited to the city or any of its wards. Again, the equitable claims which may be paid by the state out of funds raised by taxation, are those growing out of services actually rendered, and which have not been fully remunerated; as where an individual has made a contract with the state or city to build a public building or make any public improvement, and has lost

money in this undertaking. In such case, in some of the states it has been held, that although there was no legal obligation to pay, yet a tax might be imposed to raise money to make up the loss to the contractor, because his claim was based on *equity* or gratitude. It is on the same ground that pensions are given to discharged soldiers. The country is considered under a debt of *gratitude* to them for services actually rendered. But we apprehend that it would be somewhat novel to decide that a tax might be imposed to raise money to pay a debt of gratitude, when the services out of which the gratitude arises are yet to be performed, and when the party who is to perform them has already been most amply paid for what he has already done. The raising by tax money to pay in advance a debt of gratitude which may never be incurred, it appears to me, should not receive the sanction of a judicial tribunal. We must distinguish, however, between volunteers who by an unauthorized vote of a town or of its officers have been promised a bounty, and under such inducement have enlisted, and those who have enlisted without any promise or pledge of any bounty from town or city, and have actually received a bounty from private individuals. In the former case the volunteer might have such an equitable claim to the bounty pledged as to authorize a tax to pay it; in the latter no claim whatever.

Again, section 26, Article IV of the constitution of the state provides: " The legislature shall never grant any extra compensation to any public officer, agent, servant or contractor, after the services shall have been rendered, or the contract entered into." This relates undoubtedly to the officers and employees of the state. Is the state, then, absolutely prohibited from granting any extra compensation to its *own* officers, servants and employees, even as an expression of *gratitude* for services actually rendered, and yet can it give such extra compensation to the servants and employees of another sovereignty? Is she not, by the strongest implication, by the spirit, if

not by the letter of the constitution, prohibited from doing for the servants of another sovereignty what she cannot do for her own? And if she cannot do it herself, can she delegate to municipal corporations the power to do it?

For these reasons I hold that so much of the act under consideration, as authorizes the payment of bounties to volunteers who enlisted before the electors voted to raise the bounty tax, void; and as in the cases before us this illegal tax is mingled with the legal, it vitiates the whole.

6th. The act provides for paying bounties to volunteers who may have enlisted or shall hereafter enlist and become *credited to such town, city or village, upon its quota.* The laws of the United States in force at the time this act was passed, provided for assigning quotas to towns, townships, and *wards of cities*, but not to cities. It is contended, therefore, that the act is inapplicable to cities, inasmuch as there is no such thing as the quota of a city. On the other hand it is said that "although there is not literally and strictly any such thing as the quota of a city, yet that the act should receive a liberal construction, and that the quota of a city may be said to be made up of the aggregate of all the quotas of all the wards, and that where a credit is given to any ward of a city it is in fact a credit to the city." Still it is a fact that a city as a city is unknown in the act of Congress, and has no quota. If the city had a quota allotted to it, all the persons who volunteered, being residents of any ward of the city, would be credited to the city; but now if any ward furnishes more men than its quota, the excess can neither be credited to the ward nor to the city. If one half of all the wards in the city should furnish the number required of all the wards, still the city would not be out of the draft. The other wards must each furnish its own quota. The act of Congress does not authorize a draft from among the residents of one ward to make up deficiencies in another, nor does it authorize any surplus or excess of men furnished by any ward over and above its quota to be credited to or al-

lowed upon the quota of any other ward or wards. Practically, therefore, the filling of the quotas of the wards and the filling the quota of the city, if it had any quota, would be different things. This court has repeatedly decided that laws authorizing the levying and collection of taxes must be *strictly* construed, and to the same effect are many authorities. Blackwell on Tax Tit., 86; *Sharp v. Spier,* 4 Hill, 84; id., 92; *Beaty v. Knowler,* 4 Pet., 152; 2 Dallas, 316. If the act is construed strictly according to the authorities cited, the objection is well taken, and the act void as to cities.

7th. The complaint alleges that "the city of Milwaukee contains fifty thousand inhabitants, and eight thousand legal voters; that the City Hall, where the meeting was held, is not capable of holding, if filled to its utmost capacity, more than one thousand persons; that for the purpose of taking the said vote but one poll was open in the entire city, to wit, the poll in the common council room; and that it would be absolutely impossible to take the votes of one half the legal voters of said city at a single poll between the hours of nine o'clock in the morning and five o'clock in the afternoon." This allegation is not denied, and must be taken as true. The act only provides for one poll in any city, and the votes, *viva voce,* by ballot, or otherwise, are to be taken between the hours of nine o'clock in the forenoon and five o'clock in the afternoon. In fact all the business authorized to be done by the voters relative to any bounty tax to be raised, must be done in *one* day, between the hours aforesaid, and at *one* poll or place of meeting. What are the acts to be done? The meeting is to be organized; a board of inspectors are to be elected; the amount of the tax to be raised may be fixed by vote at a lower sum than that mentioned in the petition for the meeting; and if the electors choose they may, by vote, fix the amount to be appropriated to each of the purposes mentioned in the first section of the act, and the amount to each volunteer, and may also determine whether the tax to raise the amount voted shall

be levied all in one or more years. All these things must of necessity be determined by vote, taken in some other way than by ballot. Then comes the vote, which *must* be by ballot, to determine whether they will raise by tax the bounty or not. It requires but very slight knowledge of the manner of conducting such meetings, to come to the conclusion that eight thousand voters could not be polled at a single poll in eight hours, nor one half of them, saying nothing of the time that must necessarily be spent in taking the votes other than those by ballot. The allegations are not only not denied, but cannot be denied. The only thing that is alleged by way of avoidance is, that all the votes were received that were offered. This is no satisfactory answer. People could not be expected to turn out and vote when they well knew that not one half of the voters, if they turned out generally, as is usual in elections, could vote. It appears to me that the proper machinery to carry this act into effect in such a city as Milwaukee, has not been provided, and that, as to that city, the act is inoperative. There is to my mind something ludicrous in the idea of providing but one poll for eight thousand voters, to vote at by ballot in eight consecutive hours. It is not surprising that not one third of them voted. The law professes to allow the people to tax themselves or not as they please, and yet has not provided the necessary means by which they can express their wishes.

8th. Again it is said, if the act is valid in all respects, the petition for the meeting and all the subsequent proceedings are void, because the act clearly contemplates that the votes of the assembled voters should be summarily taken by division of the assembly by the uplifted hand, or otherwise than by ballot, at the taking of which all the voters had a right to be present and vote; and that to enable them to do this the room or place where the meeting is held, should be large enough to accommodate all the voters, so that all may have the privilege of voting on every resolution or motion; and inasmuch as the

rooms where the meeting was held could contain only one thousand persons, it virtually excluded from any participation in the vote electing inspectors, and various other votes, most of the legal voters, and gave the control of the meeting to a few determined men. It appears to me that there is force in this objection. The signers of the petition, who fixed the place for holding the meeting, ought to have fixed it where all the voters could have assembled and voted. Suppose they had named some room as the place of meeting which would not contain more than twenty men, and twenty had assembled there, organized the meeting and elected inspectors, could there be any question that such proceedings would have been held illegal? And can there be any question that a meeting called for eight thousand voters, at which all have a right to be present at the same time and vote summarily otherwise than by ballot on important questions, ought not to be held in a room where only one thousand could assemble? But it is said they could adjourn to another place. This is doubtful. The authorities cited to that effect are all cases where incorporated towns held meetings, and were authorized by law to hold them annually or oftener, to transact the ordinary business of the towns; and even such meetings have not a right to adjourn until they are organized, or have proper officers to preside over them. The bounty act provides that the meetings in cities "shall be held at the place designated therefor in the petition asking for the same." The act contains all the authority for holding or conducting meetings in cities to vote to raise the bounty tax; and that act says the meeting *shall* be held at the *place* designated in the petition, and gives no authority to hold it at any other place or to adjourn. It is clear the meeting is the creation of the statute, and has no power but that given by the act. But if they have a right to adjourn to another place, they could do it only by a vote of the meeting, and all legal voters would have a right to vote on the question of adjournment; of which many of them might and would be deprived

if the room in which it was taken could accommodate only one eighth of them.

For these reasons I hold that the order of the circuit court denying the injunction in the case of *Brodhead et al. v. The City*, should be reversed, and that so much of the order of the circuit court in the case of *Porter v. The City of Milwaukee*, denying the injunction prayed, as relates to the real estate of the plaintiff, should also be reversed.

Orders affirmed.