THE COUNTY OF WASHINGTON, PLAINTIFF IN ERROR, V. L. R. FLETCHER, DEFENDANT IN ERROR.

Constitutional Law: REFUNDING TAXES. The act which took effect February 20th, 1879, for the repayment of taxes levied on school lands, the legal title of which is in the state, is not in conflict with the constitution.

ERROR to the district court for Washington county. Tried below, before SAVAGE, J.

*Jesse T. Davis* and *J. C. Cowin,* for plaintiff in error.

*L. W. Osborn,* for defendant in error.

MAXWELL, J.

In 1879 the defendant presented a claim to the board of county commissioners of Washington county for taxes

paid by him upon certain school lands in that county purchased by him from the state. The lands seem to have been purchased from the state in 1869, and the legal title is still in the state. The commissioners rejected his claim. On appeal to the district court judgment was rendered in his favor for the sum of $209.90. The county brings the cause into this court by petition in error.

The county has filed no answer or other pleading setting up any defense.

The action is brought under the provisions of the "Act to provide for the repayment of moneys paid as taxes on lands, the title of which rests in the state, by persons holding said lands under contract of sale or by lease," which took effect February 20, 1879. The act reads as follows:

" Whereas, in the different counties of the state of Nebraska, there are many persons holding school lands under contract of sale or under lease from the state of Nebraska, the title to said lands being now vested in the state; and whereas, said school lands have not been and are not now taxable for any purpose whatever, therefore—

" Be it enacted by the legislature of the state of Nebraska:

"Section 1. That money heretofore received by the county treasurers of the several counties within the state of Nebraska, on account of taxes levied on lands, the title to which rests in the state of Nebraska, from persons holding said lands under contract of sale or lease, shall be repaid without interest to persons who have paid the same, their heirs, executors, or assigns.

"Sec. 2. That said moneys shall be repaid by the respective county treasurers, on orders in that behalf made by the county commissioners of the respective counties.

"Sec. 3. That no order shall be made by the county commissioners of any county for the repayment of money

paid as aforesaid into the treasury except upon the production of a receipt from the treasurer of the county, acknowledging the payment of money as taxes aforesaid, on lands owned by the state of Nebraska.

"Sec. 4. The county commissioners of any county whose school lands have been wrongfully taxed, and the taxes have not yet been paid, shall order the county treasurer to cancel the same."

It is claimed on behalf of the plaintiff that the law above quoted is in conflict with sections 1, 2, 3, and 4, of article 10 of the constitution, which read as follows:

"Section 1. The legislature shall provide such revenue as may be needful by levying a tax by valuation so that every person and corporation shall pay a tax in proportion to the value of his, her, or its property and franchises, the value to be ascertained in such manner as the legislature shall direct; and it shall have power to tax peddlers, auctioneers, brokers, hawkers, commission merchants, showmen, jugglers, inn-keepers, liquor dealers, toll bridges, ferries, insurance, telegraph, and express interests or business, vendors of patents, in such manner as it shall direct by general law, uniform as to the class upon which it operates."

Section 2 provides for the exemption of certain property. Section 3 provides for the redemption of real estate sold at tax sale. Section 4 provides that the legislature shall have "no power to release or discharge any county, city, township, town, or district whatever, or the inhabitants thereof, or any corporation or property therein, from their or its proportionate share of taxes to be levied for state purposes or due any municipal corporation, nor shall commutation for such taxes be authorized in any form whatever."

The chief justice and the writer, as members of the legislature of 1865-6, assisted in forming and submitting to the people the constitution which was adopted in 1866.

Section 2, of article 7, of that constitution provided that: " The university lands, school lands, and all other lands which have been acquired by the territory of Nebraska * * * * for educational or school purposes, shall not be aliened or sold for a less sum than five dollars per acre." The object of this provision was to protect the school fund and prevent the sale of school lands at less than their value. The act of 1867 in relation to school lands, provides for appraising school lands, and provides that they are to be offered at public sale upon due notice and sold to the highest bidder; no bids to be received for less than seven dollars per acre, nor for less than appraised value. Under this law large quantities of land have been sold at very high prices.

It is claimed, and, if the various acts passed by the legislature to grant relief to purchasers of school lands are to be taken as an indication of the popular belief upon that question, the opinion generally prevailed, that such lands were not taxable, which fact materially increased the price received for the lands sold. The case of *Hagenbuck v. Reed*, 3 Neb., 1, held that the revenue law of 1869 included school lands within its terms. Undoubtedly school lands are embraced within the letter of that act, as section 2 provides that this section "is intended to embrace lands and lots in towns, including lands bought from, or donated by, the United States and this state, and whether bought on credit or otherwise." There was no provision in the law for the sale of the interest of the purchaser as personal property, and while a sale for taxes could not divest the state of its title, it had the effect to encumber the title of such lands as reverted to the state, and thereby tended to discourage a resale of the same. This, among other considerations, doubtless, induced the legislature to pass the act for the repayment of taxes.

Section 6, of article VIII of the constitution, requires the legislature to provide for the free instruction in the

schools of the state of all persons between the ages of 5 and 21 years. This free instruction must be provided by taxation, unless by a sale of school lands a sufficient amount can be derived from the interest on the gross amount of such sales for that purpose. Hence the necessity of increasing such sales as rapidly as the lands can be sold for a fair price. Every dollar of interest derived from a sale of such lands decreases to that amount the sum necessary to be raised by taxation. It was clearly the duty of the legislature, therefore, by the enactment of just and proper laws, to encourage such sales and invite competition in order that the best possible price could be obtained.

It will be conceded that lands owned by the state are not taxable. May not the legislature provide that such lands shall not be taxable until the state conveys the legal title? This would not preclude the interest of the purchaser from being taxed, but would limit taxation to such interest. This is but justice, and tends materially to enhance the value of school lands. If the legislature may lawfully exempt the amount of the interest of the state in such lands as have been sold, but the title to which remains in the state, from taxation, may it not provide for the repayment of taxes levied upon such interest? There is no doubt of its authority to do so. The exercise of such power does not come within the inhibition of the constitution. While I fully concurred in the able opinion of the chief justice in the case of *Hagenbuck v. Reed* as a correct exposition of the language of the legislature, still the action of the legislature since that time in declaring that school lands are not taxable, and providing for the repayment of taxes paid thereon, is entitled to respectful consideration as tending to show the popular belief that such lands were not taxable.

The act for the repayment of taxes was passed in February, 1879, and an attempt seems to have been made

in the legislature of 1881 to repeal it, but although the bill passed the senate it was indefinitely postponed in the house. While these circumstances cannot be, considered by the court in the determination of this case, they tend to sustain the defendant's plea that he purchased under the belief that the lands were not taxable. There is a clear distinction between the repayment of taxes levied upon lands owned by the state—upon property which the taxpayer did not own, which taxes, in the opinion of the legislature, were unjust, and a personal gift or donation. The record in this case is exceedingly meager. There is no copy of the assessment, nor does it appear what valuation was placed upon the land in controversy for any of the years for which taxes have been paid, and it is impossible to say from this record what taxes have been included in the judgment. In conclusion, we hold that the legislature may lawfully exempt the interest of the state in the school lands from taxation. In other words, if lands are sold at a given price, and one-tenth of the purchase price paid, the purchaser may be required to pay a tax upon his interest in the land and improvements, while the amount owing to the state may be exempt; and if the state may thus exempt such interest, it may provide for the repayment of such taxes.

It follows that the judgment must be affirmed.

JUDGMENT AFFIRMED.

LAKE, CH. J., dissenting.

I cannot concur with the majority of the court in their opinion in this case, but dissent for the following reasons:

They concede the fact to be, as it doubtless is, that when the taxes in question were levied and paid, the land upon which they were imposed was taxable. This concession accords fully with the unanimous decision of this court in *Hagenbuck v. Reed,* 3 Neb., 1, which is still pro-

fessedly adhered to, although at the same time practically nullified, because, as expressed in the above opinion, "the action of the legislature since that time in declaring that school lands are not taxable, and providing for the repayment of taxes paid thereon, is entitled to respectful consideration, as tending to show the popular belief that such lands are not taxable." Has it, indeed, come to this, that the highest court in the state, the one whose especial duty it is, under the constitution, to expound the law and enforce it, must conform its decisions, not to the law as it is, but to what "popular belief" would make it?

I have accustomed myself to suppose that the decisions of this court as to the meaning and effect of statutes were binding upon, and to be observed by, not only individuals, but every department of the state government, the legislature included. But in this it seems I was mistaken. In the case of *Hagenbuck v. Reed*, before referred to, wherein the taxability of school lands sold by the state but not yet fully paid for was squarely presented, the decision was that they were taxable, and the legislature, after this rule had been acted upon for more than six years, in the act referred to in the majority opinion, under a "whereas," declare that such lands "have not been, and are not now taxable for any purpose whatever." And to this unwarrantable, unconstitutional, and most offensive assumption, the court with exceeding humility responds, in a seeming apology for its former decision, that it "is entitled to respectful consideration," etc.

Well, the legislature having succeeded through the instrumentality of a "whereas" in formally reversing the settled rule that these lands were taxable, and thereby establishing the apparent illegality of the taxes that had been collected thereon, an excuse was afforded for directing a repayment. And doubtless some sort of excuse was necessary, for, without one, the scheme of tak-

ing money from the treasury and presenting it, not as a donation to any of the various public uses for which money may be appropriated by the legislature, but *as a naked personal gift,* which it was, might have been too manifestly unconstitutional to have been carried even in that legislature.

But, even if this excuse were something more than mere pretext, which, however, it is not, still I could not admit that the legislature had the constitutional right to impose the burden of repayment wholly upon those counties wherein the money was raised.

These taxes were levied in pursuance of, and for the various purposes specified in the general revenue law. A large portion was for state uses exclusively, in which all of the people of the state were equally interested, and to which they were bound to contribute in proportion to the taxable property which they possessed. Although the fact is not disclosed by the record, yet it is but reasonable to presume that, from time to time, as the yearly collections of taxes were made, the money was duly distributed by the treasurer, and has long since been expended for the several purposes to which the laws devoted it. This being so, I would like to know the principle by which the county wherein the money happened to be collected can be made liable for the portion that has gone to uses other than its own, to the exclusion of all the others. How, I ask, can the payment of a state debt, or obligation of any kind, be lawfully required of any less than the whole body of the people? Suppose, for instance, that it were now proposed to raise by taxation for exclusively state purposes an amount equal to the share that the state has used of the taxes realized from these school lands, could the legislature constitutionally levy the whole of it upon one county, or upon any number of counties less than the whole? Surely no one will so contend. But what is the difference in principle between

such an imposition—taxation with a view to future expenditures—and one to satisfy an obligation growing out of an expenditure previously made? I can see no difference whatever, and therefore hold that, in either case, the burden should be laid, and can only be laid constitutionally, upon the whole of the taxable property of the state.

In support of my position on this point, I need only refer to certain provisions of the constitution which bear directly thereon, and of the effect of which there can be no reasonable doubt. Section 1, article IX., declares that: "That the legislature shall provide such revenue as may be needful, by levying a tax by valuation, so that every person and corporation shall pay a tax in proportion to the value of his, her, or its property and franchises, the value to be ascertained in such manner as the legislature shall direct," etc. Section 4 of the same article provides that: "The legislature shall have no power to release or discharge any county, city, township, town, or district whatever, *or the inhabitants thereof*, or any corporation, *or the property therein*, from their or its proportionate share of taxes to be levied for state purposes, or due any municipal corporation, nor shall commutation for such taxes be authorized in any form whatever."

This language is mandatory; it could not be more positive. It enjoins upon the legislature the duty of imposing the burdens of the state government upon all sections, and the people thereof, in proportion to the value of their taxable property. If a sum of money is to be raised for any state purpose, contribution must be required from all of the counties alike, and in proportion to the value of the taxable property therein, or these provisions of the constitution are violated. Therefore, if these moneys could lawfully be refunded at all, I am clearly of the opinion that the portion collected and used for state purposes should be borne by the state at large,

and cannot be, constitutionally, imposed upon the county of Washington alone.

But, it is equally clear to my mind that the legislature has no right to provide for the repayment of these taxes at all. As I have already shown, they were lawfully levied and collected, notwithstanding the incompetent and unconstitutional assertion of the legislature to the contrary. Their payment was but the satisfaction of a just debt due from the tax-payer as his constitutional share of the public burdens during the years for which they were levied, and from which the legislature had "no power," in the language of the constitution above quoted, "to release or discharge" him. Now, if there were no power in the legislature to release the party from the obligation to make the payment, with what reason can it be held that the money, when paid, may be restored to him? If such is to be the rule of construction, if these most valuable provisions of the constitution may be thus easily evaded, then indeed may it truthfully be said of that instrument that, in its strength, it is but " a rope of sand."

And there is still another reason, equally strong, why the legislature have not the authority to compel the county to pay over this money—to make this donation to the defendant in error. The only mode by which the necessary funds with which to do so can be obtained is, of course, by taxation. But it is well settled that taxation for a purely private purpose is unwarranted. That this purpose is private—that it is simply a gift in no way connected with the public welfare, is established by the fact that nothing is legally due from the county to him to whom the payment is directed to be made.

Speaking on the subject of taxation, Mr. Cooley, in his work on Constitutional Limitations, * 487, says: "Everything that may be done under the name of taxation is not necessarily a tax; and it may happen that an

oppressive burden imposed by the government, when it comes to be carefully scrutinized, will prove, instead of a tax, to be an unlawful confiscation of property, unwarranted by any principle of constitutional government." And at * 488: "An unlimited power to make any and everything lawful which the legislature might see fit to call taxation, would be, when plainly stated, an unlimited power to plunder the citizen." And again at * 490: "But we think it clear, in the words of the supreme court of Wisconsin, that 'the legislature cannot * * * in the form of a tax, take the money of the citizen and give it to an individual, the public interest or welfare being in no way connected with the transaction. The objects for which money is raised by taxation must be public, and such as subserve the common interest and well being of the community required to contribute.' Or as stated by the supreme court of Pennsylvania, ' the legislature has no constitutional right to * * * levy a tax, or to authorize any municipal corporation to do it, in order to raise funds for a mere private purpose. No such authority passed to the assembly by the general grant of legislative power. This would not be legislation. Taxation is a mode of raising revenue for public purposes. When it is prostituted to objects in no way connected with the public interest or welfare, it ceases to be taxation and becomes plunder. Transferring money from the owners of it into the possession of those who have no title to it, though it be done under the name and form of a tax, is unconstitutional for all the reasons which forbid the legislature to usurp any other power not granted to them.'" See also *Freeland v. Hastings,* 10 Allen, 570. *Morford v. Unger,* 8 Iowa, 82. *Brodhead v. Milwaukee,* 19 Wis., 624. *Sharpless v. Mayor, &c.,* 21 Penn. St., 147. *Bristol v. Johnson,* 34 Mich., 123. Many more cases to the same effect could be cited, but I deem these sufficient upon a point so well settled.

These are the chief objections that I find to the affirmance of this judgment, and I deem them unanswerable. It is very much to be regretted that the views of the court on the points which I have thus discussed were not given in the majority opinion. It would certainly have been a source of great satisfaction to me as a member of the court, and I doubt not also to counsel who so ably presented them in argument, to have seen the reasoning by which they were overcome; to have been advised of the principle of constitutional law under which the legislature can nullify a solemn judgment of this court; and by which the people of a single county can be subjected to the payment of a state obligation, or taxed for a purpose purely private, and in no way connected with the public welfare. For these reasons I think the judgment should be reversed.

Cobb, J.

While I concur in the judgment of affirmance in this case, I do not reach the conclusion to do so by exactly the same line of reasoning as that pursued by Mr. Justice Maxwell, to whom the writing of the opinion of the court was assigned.

It is true that in the case of *Hagenbuck v. Reed*, 3 Neb., 1, it was held that "lands donated to this state by the United States for school purposes, and which have been sold on credit, are subject to taxation, although the state has not actually parted with the legal title." I was a member of the bar at that time, and while then, as now, entertaining the most profound respect for the court as then constituted, I could not bring my mind to agree to the law or the wisdom of that opinion.

The levy of taxes, and sale of lands for the non-payment thereof, although made by county officers, are made in the name of the state, and derive their validity from state authority. If the statute quoted by the then

and now Chief Justice, in *Hagenbuck v. Reed, supra,* be construed to authorize the levy of taxes upon school lands bought on credit from the state, and upon which but a small per cent. of the purchase price had been paid, and to authorize the sale thereof for such taxes in case of their non-payment, then one of two things would necessarily follow: The law would authorize the sale of school lands at a price far below the minimum fixed by the constitution then in force, or it would authorize the issuance of a certificate of sale, and finally a deed for such land, which would bear a lie on their face, and become a " delusion and a snare " to the purchaser. It is scarcely possible that the legislature, in its keenest search for subjects of taxation, could have intended either of these results. And while the first is amply guarded against by constitutional prohibitions, there are provisions in the same revenue act which, to my mind, might well have excused the court in placing a construction thereon, avoiding the second.

The learned court, in the said opinion, lays considerable stress on the well known rule of construction that, "in giving a construction to a statute, we must, if possible, give effect to all its several parts." With this rule in view, it is quite remarkable that no construction is given to the language of the first sub-division of sec. 1 of the revenue law, enumerating property exempt from taxation, which is in these words: "First. The property of the United States and this state, including school lands." It seems to me that the opinion violates the rule above quoted in giving no effect to the words, "including school lands,' in this sub-division. If the words, " school lands," as here used, are to be confined to the sixteenth and thirty-sixth sections, before they are sold on credit or otherwise, then why are they specially mentioned here, to the exclusion of the penitentiary, the capitol, and the saline lands? All of these lands were, in the first in-

stance, as clearly exempt from taxation as the school lands, and until sold they, as well as the school lands, were exempt under the preceding words, " the property of the United States and this state." The true and only answer, in my opinion, is to be found in this construction. The laws then in force, or enacted contemporaneously with the said revenue law, provided for the sale' of the penitentiary, the capitol, and the saline lands, for cash down, and for the expenditure of the monies derived from such sales in the erection of a state penitentiary, state capitol, state hospital for the insane, etc., while the capital to be derived from the sale of the school lands was never to be expended, and its diminution, by any means, was solemnly forbidden by constitutional provisions.

In the case of the saline lands, for instance, upon the sale of a parcel of that the purchaser was required to pay for it down in full; if he failed to do so, it was declared no sale and the lands again offered, but upon payment being made a conveyance was executed therefor immediately, and thereupon it ceased to be saline land, was no longer the property of the state and was thereafter taxable. On the other hand, the law provided for a careful appraisement of the school lands, that the value thereof as fixed by the appraisers, if the same exceeded seven dollars per acre, should be the minimum price at which the same·might be sold; but if such value should be fixed by the appraisers below that sum, then seven dollars per acre should be the minimum price at which such lands might be sold. The sale of such school lands was provided to be made on a credit of ten years, at a rate of interest which, although now the maximum legal rate, was at that time deemed very low. The law further provided for the leasing of the school lands, with certain exceptions and qualifications, for the term of twenty-five years, and provided further that "in case of the violation

24

of any of the covenants in the contract furnished, by the lessee or purchaser, by the non-payment of moneys at the time specified in the contract, by the commission of waste upon the land, removal of any improvements thereupon from the land without the consent of the commissioners, the county treasurer shall notifiy the lessee or purchaser of his or her delinquency, and require the removal thereof by the fulfillment of the covenants of the bond and contract, and if such delinquency is not removed within thirty days, the lessee or purchaser shall yield possession of the premises to the state of Nebraska, and the property shall thereupon immediately revert to and be revested in the state; and the contract shall be dissolved, and the right of the lessee or purchaser, both legal and equitable therein be absolutely determined; and the prosecuting attorney of the district shall immediately, after receiving notice from the county treasurer of the violation of his or her covenants, by the lessee, or purchaser of any school land, proceed against the person in possession of the premises involved, in the name of the people of the state of Nebraska for forcible detainer, and obtain restitution of the premises, in the same manner and with like effect as in case of tenants holding over."

I have quoted the above section for the purpose of showing that the law treated these lands, whether in the possession of lessee or of purchaser, exactly the same, and, as I think, still as *school lands* as well after the sale as after the leasing thereof. True, it speaks of the property reverting to, and becoming revested in, the state, which, it may be claimed, implies that it had passed out of the state; but this language is used in reference to the leased as well as to the purchased lands, and I think that it has never been claimed that the property in the leased lands has ever passed out of the state or that they were taxable.

I think that, construing all the provisions of these

statutes together, the so-called sale and purchase of school lands on credit was, in legal effect, only a leasing of them with a privilege of purchasing by a full payment of the price, and in the contemplation and meaning of the first section of the revenue act, they remain *school lands* until the full price was paid over, and took the place of the lands in the permanent school fund.